**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| HARLAND CLARKE HOLDINGS CORP. AND SCANTRON CORPORATION, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | C.A. No.  1:14-cv-00138-GMS |
| MICHAEL MILKEN AND KALYANARAMAN SRINIVASAN, | ) ) ) | |
| Defendants. | ) ) | |

**OPENING BRIEF IN SUPPORT OF DEFENDANT KALYANARAMAN SRINIVASAN'S
MOTION FOR SUMMARY JUDGMENT ON ALL COUNTS**

**PEPPER HAMILTON LLP**

Edmond D. Johnson (Del. Bar No. 2257)
Bradley W. Voss (Del. Bar No. 4318)
James H. S. Levine (Del. Bar No. 5355)
Christopher B. Chuff (Del. Bar No. 5729)
1313 Market Street, Suite 5100
Wilmington, DE 19899-1709
Telephone: 302.777.6500
Facsimile:  302.421.8390
*johnsone@pepperlaw.com*
*vossb@pepperlaw.com*
*levinejh@pepperlaw.com*
*chuffc@pepperlaw.com*

Dated:  July 18, 2014

*Attorneys for Defendant Kalyanaraman Srinivasan*

27061693

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | NATURE AND STAGE OF THE PROCEEDINGS | 1 |
| II. | SUMMARY OF ARGUMENT | 3 |
| III. | STATEMENT OF FACTS AND CONTENTIONS OF PLAINTIFFS | 3 |
| IV. | ARGUMENT | 11 |
| | A.   Standard of Review | 11 |
| | B.   The Limitations That Bar This Action Found In Sections 1, 6 And 10 Of The Limited Guarantee Are Legal, Valid And Enforceable | 11 |
| | C.   Plaintiffs' Case Requires Them To Prove Justifiable Reliance On Material Misrepresentations, But That Is Not Possible In Light Of The Disclaimers, Affirmations, And Agreements Reflected In The Transaction Documents | 16 |
| V. | CONCLUSION | 20 |

## <u>TABLE OF AUTHORITIES</u>

| <u>Cases</u> | <u>Page(s)</u> |
|---|---|
| *ABRY Partners V, L.P. v. F&W Acquisition LLC,*<br>891 A.2d 1032 (Del. Ch. 2006) | 15, 16, 17 |
| *Aspen Advisors LLC v. United Artists Theatre Co.,*<br>843 A.2d 697 (Del. Ch. 2004) | 15 |
| *DeBakey Corp. v. Raytheon Service Co.,*<br>2000 Del. Ch. LEXIS 129 (Del. Ch. Aug. 25, 2000) | 18 |
| *Emmons v. Hartford Underwriters Ins. Co.,*<br>697 A.2d 742 (Del. 1997) | 11 |
| *Great Lakes Chem. Corp. v. Pharmacia Corp.,*<br>788 A.2d 544 (Del. Ch. 2001) | 14 |
| *Great-West Investors LP v. Thomas H. Lee Partners, L.P.,*<br>2011 Del. Ch. LEXIS 6 (Del. Ch. Jan. 14, 2011) | 15 |
| *GRT, Inc. v. Marathon GTF Technology, Ltd.,*<br>2011 Del. Ch. LEXIS 99 (Del. Ch. July 11, 2011) | 14 |
| *In re IBP, Inc. Shareholders Litigation,*<br>789 A.2d 14 (Del. Ch. 2001) | 14, 18 |
| *Market America, Inc. v. Google, Inc.,*<br>2011 U.S. Dist. LEXIS 42099 (D. Del. Apr. 19, 2011) | 16 |
| *Matthews Office Designs, Inc. v. Taub Investments,*<br>647 A.2d 382 (Del. 1994) | 16 |
| *MBIA Insurance Corp. v. Royal Indemnity Co.,*<br>426 F.3d 204 (3rd Cir. 2005) | 2, 13 |
| *NACCO Industries, Inc. v. Applica Inc.,*<br>997 A.2d 1 (Del. Ch. 2009) | 15 |
| *Nemec v. Shrader,*<br>991 A.2d 1120 (Del. 2010) | 15 |

*O'Brien v. Progressive Northern Insurance Co.*,
    785 A.2d 281 (Del. 2001)                                              13

*One-O-One Enterprises, Inc. v. Caruso*,
    848 F.2d 1283 (D.C. Cir. 1988)                       2, 13

*Organ v. Byron*,
    435 F. Supp. 2d 388 (D. Del. 2006)                   12

*Progressive International Corp. v. E.I. Du Pont de Nemours & Co.*,
    2002 Del. Ch. LEXIS 91 (Del. Ch. July 9, 2002)       *passim*

*RAA Management, LLC v. Savage Sports Holdings*,
    45 A.3d 107 (Del. 2012)                               14

*Related Westpac LLC v. JER Snowmass LLC*,
    2010 Del. Ch. LEXIS 158 (Del. Ch. July 23, 2010)     14, 15

*Warner Theatre Associates Ltd. P'ship v. Metropolitan Life Insurance Co.*,
    149 F.3d 134 (2d Cir. 1998)                         11, 14

## **Rules**

F.R.C.P. 12(b)(6)                                            11

F.R.C.P. 56(a)                                              1

## **Other Authorities**

Black's Law Dictionary (9th Ed. 2009)                     17

## I.      NATURE AND STAGE OF THE PROCEEDINGS

This is the opening brief of defendant Kalyanaraman Srinivasan ("Kal Raman" or "Raman") in support of his motion for summary judgment.  Plaintiffs Scantron Corporation and Harland Clarke Holdings Corp. are sophisticated parties who commenced this action in Texas state court, notwithstanding their "irrevocabl[e] and unconditional[]" agreement in the applicable transaction documents not to sue except in Delaware.  After the case was removed to the United States District Court for the Western District of Texas, the Honorable Xavier Rodriguez entered a 32-page order dated February 4, 2014, transferring the case to this court (the "Order"), over plaintiffs' voluminous objections.  A copy of the Order is submitted herewith as Exhibit A.

Judge Rodriguez ruled that the "plain language of the Transaction Documents evidences the parties' intent that whatever claims were brought by Scantron or its Affiliates (including Harland Clarke) against Raman … those claims would be brought only 'under and in accordance with [the] Guarantee,' … and subject to the limitations described therein."  (Order at 16).  Those limitations included, among other things, a covenant by plaintiffs not to sue Raman except for "claims by the Guaranteed Party [plaintiff Scantron] against the Guarantor [Raman] under and in accordance with this Guarantee," and that this was plaintiffs' "sole and exclusive" remedy "in respect of any liabilities or obligations arising under, or in connection with [the transaction documents], or the transactions contemplated thereby …."  (Limited Guarantee § 6(b)).  This limitation was agreed to by plaintiffs after "carefully read[ing] and fully understand[]ing" the Limited Guarantee and having "had it fully explained to them by" counsel, a top-tier corporate law firm.  (Limited Guarantee § 14).  In exchange for plaintiffs' promise, Raman granted Scantron a valuable guarantee relative to the obligations of Scantron's counterparty to a Securities Purchase Agreement ("SPA").  (*See* Limited Guarantee §§ 1-15).

Nonetheless, plaintiffs have pressed and continue to press claims that violate the agreement that governs their relationship with Raman. Plaintiffs' claims are not "under and in accordance with" the Limited Guarantee; in fact, plaintiffs expressly represented to the Western District of Texas that they do not "base their right to recover on the terms of the contract," nor are they "challenging" or "complaining about Raman's performance under his Limited Guarantee …." (Order at 10-12). To the extent plaintiffs were, they would be subject to various limitations, including a liability cap, which perhaps explains why plaintiffs do not even mention the Limited Guarantee in their complaint, attempting instead to make an end-run around their own agreement by way of vague allegations of extra-contractual fraud.

The parties chose Delaware law for "all matters relating" to their agreement. (Limited Guarantee § 12). Under Delaware law, sophisticated parties, such as plaintiffs, are bound by the agreements that they make, even agreements that disclaim extra-contractual fraud. *E.g.*, *MBIA Ins. Corp. v. Royal Indemn. Co*., 426 F.3d 204, 220 (3rd Cir. 2005) (affirming summary judgment based on company's contractual waiver of fraudulent inducement) (Alito, J.); *Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co*., 2002 Del. Ch. LEXIS 91, *22 (Del. Ch. July 9, 2002) ("presumption that parties will be bound by the language of the contracts they negotiate holds even greater force when, as here, the parties are sophisticated entities that bargained at arm's length.") (Strine, V.C.); *cf. One-O-One Enters. v. Caruso*, 848 F.2d 1283, 1287 (D.C. Cir. 1988) (if plaintiffs were allowed to use antecedent representations or nondisclosures to defeat agreement, "contracts would not be worth the paper on which they are written") (Ginsburg, J.).

Consistent with applicable law, the no-recourse and related terms of the Limited Guarantee must be enforced. Otherwise, Raman will be deprived of the benefit for which he

provided substantial consideration, and plaintiffs will be rewarded for their own breaches of the

Limited Guarantee, a result that would be both unfair to Raman and bad precedent for

sophisticated parties forging future contracts.

## II.     SUMMARY OF ARGUMENT

1.      Plaintiff Scantron agreed, on behalf of itself and its affiliates (including co-

plaintiff/parent company Harland Clarke) that they would not sue Raman as they have done in

this litigation.  Rather, litigation against Raman was only permitted to be brought under and in

accordance with a Limited Guarantee, and subject to the limitations described therein.  That

agreement is valid, legal and enforceable against plaintiffs, who have admitted that their

litigation is not based on the Limited Guarantee.  This is fatal to plaintiffs' case.

2.      In addition, each of plaintiffs' purported claims requires plaintiffs to prove

justifiable reliance on alleged material misrepresentations by Raman.  Plaintiffs cannot

demonstrate such reliance in light of the representations, agreements and disclaimers that they

made in the operative contracts.  This is also fatal to plaintiffs' case.

## III.    STATEMENT OF FACTS AND CONTENTIONS OF PLAINTIFFS[1]

After a lengthy due diligence process, Scantron agreed to purchase a business based in

Bellevue, Washington known as GlobalScholar from non-party KUE Digital International LLC

("Seller"). (Am. Compl. ¶¶ 17-34).  Plaintiffs allege that Raman was CEO of GlobalScholar.

(Am. Compl. ¶ 8).  To effectuate the transaction, Scantron entered into a Securities Purchase

Agreement ("SPA") of 78 pages (not including voluminous Disclosure Schedules, etc.) with

Seller, and several related agreements, including a 9-page Limited Guarantee with defendant

---

[1] The authenticity of the SPA and Limited Guarantee are not disputed.  Both documents
were submitted by affidavit to the transferring court by both plaintiffs and defendants in
connection with the transfer dispute.  (*See* Doc. 31-1 filed 10/21/13; Doc. 18-2 filed 09/30/13).
The Limited Guarantee and SPA are submitted herewith as Exhibits B and C, respectively.

Raman.  These agreements were executed in December 2010.  (Exhibits B and C hereto).

Scantron alleges that the purchase price for the acquisition was $135,000,000.  (*E.g.*, Am.

Compl. ¶ 34; *see also* SPA Art. 1 ($140,000,000 Base Consideration subject to several

downward adjustments)).

    Scantron claims to serve 96% of the top school districts in the nation, and to have almost

half a century of experience.  *See* http://scantron.com/about-us/company/our-story (downloaded

July 14, 2014).  Both Scantron and its co-plaintiff Harland Clarke are Delaware corporations.

(Am. Compl. ¶¶ 1-2).  Harland Clarke "owns and operates multiple businesses," including

Scantron.  (Am. Compl. ¶ 12).  Plaintiffs claim to be part of the MacAndrews & Forbes

("MFW") family of companies. (*Id.*).  Plaintiffs allege that officers, agents, and other

representatives of Harland Clarke, with assistance from MFW personnel, conceived of the

acquisition of the GlobalScholar business for its Scantron subsidiary and led the acquisition

negotiations and due diligence efforts.  (Am. Compl. ¶ 12).  In connection with the

GlobalScholar transaction, Scantron represented that it was "buying for its own account," was

"an 'accredited investor' as defined in Regulation D … under the Securities Act of 1933," and

"acknowledge[d] that it is informed as to the risks of the transactions contemplated hereby and of

ownership of the Securities."  (SPA § 4.06).  Scantron was also represented in the transaction by

a top-tier corporate law firm, and stipulated that it actively participated in the negotiation and

drafting of the agreements.  (*E.g.*, SPA §§ 11.02, 11.06, 11.13; Limited Guarantee §§ 9, 13-14).

    The SPA contains a large number of representations and warranties relating to the Seller

(Article II) and relating to the purchased subsidiaries (Article III), as well as other covenants and

agreements.  (*See* SPA at 13-29).  The buyer, Scantron, itself made several representations and

agreements in the SPA.  Among those, Scantron acknowledged and agreed that there were no

extra-contractual representations or warranties (*i.e.*, representations or warranties other than the

numerous ones provided in the contract).  Scantron also agreed that any express or implied extra-

contractual representation was "specifically disclaimed."  For instance, SPA section 3.21

provides that:

> ***Except for the representations and warranties contained in this Agreement or the other Transaction Documents***, Seller makes no express or implied representation or warranty in respect or on behalf of Seller or any of its Affiliates, and Seller ***disclaims any such representation or warranty***, whether by Seller ***or any of its officers, directors, employees, agents or representatives or any other Person***, and irrespective of when made or delivered, ***with respect to*** the execution and delivery of this Agreement or any other Transaction Document, the consummation of the transactions contemplated hereby and thereby or ***the businesses, assets, liabilities, obligations or prospects of any of the Purchased Subsidiaries or their Subsidiaries***, notwithstanding the delivery or disclosure to Buyer or any of its officers, directors, employees, agents or representatives or any other Person of any documentation or other information with respect to the foregoing.[2]

Similarly, SPA section 6.06 reflects (in "all caps" typeface) Scantron's agreement and

acknowledgement that:

> (a)  EACH OF THE PARTIES HERETO ACKNOWLEDGES THAT THE REPRESENTATIONS AND WARRANTIES BY THE OTHER PARTIES SET FORTH IN THIS AGREEMENT AND ANY CERTIFICATE DELIVERED HEREUNDER, CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES OF THE OTHER PARTIES IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY, AND ***EACH OF THE PARTIES HERETO UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT ALL OTHER REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE EXPRESS OR IMPLIED (INCLUDING, BUT NOT LIMITED TO, ANY RELATING TO THE FUTURE FINANCIAL CONDITION OR PROJECTIONS, RESULTS OF OPERATIONS, ASSETS OR LIABILITIES OF THE PURCHASED SUBSIDIARIES OR THEIR SUBSIDIARIES OR ANY OTHER PERSON) ARE SPECIFICALLY DISCLAIMED BY THE PARTIES***.

---

[2] Emphasis added.  Where emphasis is added herein, it is shown in ***bold and italics***; all other quoted typefaces (all caps, italics, underline) are in the original unless otherwise noted.

In addition, SPA section 11.08 contains the "Complete Agreement" clause:

> This Agreement (including the exhibits hereto and the Disclosure Schedules) and the documents referred to herein (including the Escrow Agreement) contain the ***complete agreement between the Parties hereto and supersede any prior understandings, agreements or representations*** by or between the Parties, written or oral, which may have related to the subject matter hereof in any way.

Scantron was a signatory to the SPA.  It also signed the Limited Guarantee with Raman. The Limited Guarantee is the only transaction document signed by Raman; it sets forth obligations of Raman and Scantron and its affiliates.

The Limited Guarantee gave Scantron (the Guaranteed Party) rights *vis-à-vis* Raman (the Guarantor), rights that otherwise it would not have had.  For Raman's agreement to sign the Limited Guarantee – and thereby put his wallet behind the payment and indemnification obligations of the Seller, to a precisely negotiated extent – Scantron agreed to the limits of its rights of recovery against Raman by way of various covenants, caps, and other terms in the Limited Guarantee.

In exchange for this valuable right, Scantron expressly covenanted not to sue Raman except under and in accordance with the Limited Guarantee, and further made the Limited Guarantee subject to a liability cap.  As set forth in greater detail below, section 1 caps Raman's maximum liability at 5.2% of the purchase price (minus certain amounts, based on the formulae set forth in the Limited Guarantee):

***Notwithstanding the foregoing, the parties agree that***:

(a)  ***the maximum aggregate liability of Guarantor and the Other Guarantors under the Guarantees collectively (the "Maximum Amount") shall not exceed (I) the Purchase Price actually received by Seller***, <u>less</u> (II) the sum of (without duplication) (x) the aggregate amount of any Losses or other amounts (other than any Adjustment Amount) actually paid to the Buyer Indemnified Parties by Seller or any of its Affiliates under or in respect of the Purchase Agreement, (y) the aggregate amount of any Losses or other amounts actually paid to the Buyer Indemnified Parties by the Guarantor and/or the Other Guarantors under or in respect of the Guarantees and (z) any portion of the Obligations of which Seller, the Guarantor or the Other Guarantors is/are relieved by the satisfaction thereof or pursuant to any written agreement with Buyer and/or the Guaranteed Party;

(b)  ***the maximum aggregate liability of Guarantor under this Guarantee (the "Aggregate Guarantor Cap") shall not exceed Guarantor's Pro Rata Portion of the Maximum Amount***, <u>less</u> the sum of (without duplication in respect of amounts already deducted from the Maximum Amount in accordance with <u>Section 1(a)</u> or in respect of the following) (x) the aggregate amount of any Losses or other amounts (other than any Adjustment Amount) otherwise actually paid to the Buyer Indemnified Parties by the Guarantor under or in respect of this Guarantee and (y) any portion of the Obligations of which the Guarantor is relieved by the satisfaction thereof or pursuant to any written agreement with Buyer and/or the Guaranteed Party; and

(c)  ***the maximum liability of Guarantor under this Guarantee in respect of a specific Loss, Adjustment Amount, fee, Tax or other specific payment obligation of Seller included in the Obligations (the "Per Claim Guarantor Cap" and, together with the Maximum Amount and the Aggregate Guarantor Cap, the "Caps") shall not exceed the Guarantor's Pro Rata Portion thereof***.  In furtherance of the foregoing, the Guarantor acknowledges that the Guaranteed Party may, in its sole discretion, bring and prosecute a separate action or actions against the Guarantor for the Guarantor's Pro Rata Portion of the full amount of the Obligations (subject to the Caps) regardless of whether (a) an action is brought against Seller or any other Person or to realize upon any security for the Obligations, (b) Seller is joined in any such action or (c) notice is given or demand is made upon Seller.  The Guarantor and the Guaranteed Party acknowledge and agree that this Guarantee cannot be enforced without giving effect to each of the Caps.  ***The "Pro Rata Portion" for (i) Guarantor shall be 5.2%, (ii) KUELP shall be 83.9%, (iii) Ignition I shall be 10.6% and (iv) Ignition II shall be 0.3%.***

As previously noted, Scantron also expressly covenanted not to sue Raman except under and in accordance with the Limited Guarantee.  Section 6, titled "No Recourse," provides:

> (b)  *The Guaranteed Party hereby covenants and agrees that it shall not institute, and shall cause each of its Affiliates and representatives not to institute*, directly or indirectly, *any Action arising under, or in connection with, this Guarantee, the Purchase Agreement or the transactions contemplated thereby against the Guarantor* or any Non-Recourse Party *except for (i) claims by the Guaranteed Party against the Guarantor under and in accordance with this Guarantee* or (ii) claims by the Guaranteed Party against Seller under and in accordance with the Purchase Agreement.  Recourse against the Guarantor and/or the Seller in accordance with Actions permitted by clauses (i) and (ii) immediately above *shall be the sole and exclusive remedy* of the Guaranteed Party and all of its Affiliates against the Guarantor or any Non-Recourse Party *in respect of any liabilities or obligations arising under, or in connection with, the Purchase Agreement* or any of the other agreements contemplated thereby, *or the transactions contemplated thereby*, and such recourse shall be subject to the limitations described herein and therein.

In addition to the "No Recourse" clause, section 10 of the Limited Guarantee terminates the Guarantor's obligations if, among other things, the "Guaranteed Party or any of its Affiliates" asserts in litigation claims inconsistent with the limitations set forth in the Limited Guarantee:

> (b)  Notwithstanding the foregoing, *this Guarantee shall terminate and the Guarantor shall have no further obligations under this Guarantee, on the earliest to occur of* (i) … (ii) …; and (iii) *such time, if any, as the Guaranteed Party or any of its Affiliates asserts in any litigation or other proceeding* that the provisions of <u>Section 1</u> hereof limiting the Guarantor's liability to the Caps or the provisions of <u>Section 6</u> or this <u>Section 10</u> hereof are illegal, invalid or unenforceable in whole or in part, or asserts *that the Guarantor is liable in excess of any of the Caps, or asserts any theory of liability against the Guarantor or any Non-Recourse Party with respect to the Obligations other than (x) liability of the Guarantor under this Guarantee (as limited by the provisions hereof), (y) liability of the Guarantor arising out of intentional fraud by the Guarantor, subject to the Caps*, or (z) liability arising from a material breach of any of the representations and warranties set forth in <u>Section 5</u>.  *In the event of any assertion of the types specified in clause (iii)* immediately above, then (A) the Obligations of the Guarantor under this Guarantee shall terminate *ab initio* and be null and void, (B) if the Guarantor has previously made any payments under this Guarantee, it shall be entitled to recover such payments from the Guaranteed Party, and (C) *neither the Guarantor nor*

> *any Affiliate of the Guarantor shall have any liability whatsoever to the Guaranteed Party or any Non-Recourse Party (whether at law or in equity, whether sounding in contract, tort, statute or otherwise) with respect to the Obligations or under this Guarantee*.

The parties selected Delaware law to govern their disputes, as reflected in section 12 of the Limited Guarantee:

> *All matters relating to this Guarantee or the breach, interpretation, construction, validity, termination and enforcement of this Guarantee shall be governed by and construed in accordance with the domestic laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule* (whether of the State of Delaware or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than the State of Delaware.

In section 14 of the Limited Guarantee, Scantron represented that it, among other things, fully understood the Limited Guarantee and received from counsel a full explanation of it:

> 14.  <u>Representation by Counsel</u>.  Each party represents and agrees with each other that it has been represented by or had the opportunity to be represented by, independent counsel of its own choosing, and that it has had the full right and opportunity to consult with its respective attorney(s), that to the extent, if any, that it desired, it availed itself of this right and opportunity, *that it or its authorized officers (as the case may be) have carefully read and fully understand this Guarantee in its entirety and have had it fully explained to them by such party's respective counsel, that each is fully aware of the contents thereof and its meaning, intent and legal effect*, and that it or its authorized officer (as the case may be) is competent to execute this Guarantee and has executed this Guarantee free from coercion, duress or undue influence.[3]

Two-and-a-half years after acquiring the GlobalScholar business in January 2011 pursuant to the transaction, plaintiffs sued over alleged pre-transaction "lies and deception." (Am. Compl. at 3 (filed 10/11/13)).  By way of their complaint, originally filed in Texas state court in violation of the Delaware forum selection clause, and their amended complaint, plaintiffs sued Raman and co-defendant Milken for the full purchase price of $135,000,000,

---

[3] The "Governing Law" and "Representation by Counsel" sections of the Limited Guarantee have parallels in the SPA.  (*See* SPA §§ 11.10, 11.13).

which was paid to an entity that is not even a party to this action, "plus the additional multiple millions of dollars invested in the GlobalScholar platform by Plaintiffs after the acquisition … plus substantial consequential damages, punitive damages, attorneys' fees, costs of court, and litigation expenses, interest and other damages …." (Am. Compl. ¶¶ 10-11).

All of plaintiffs' "counts" are based on theories of fraud or misrepresentation to induce plaintiffs to enter into the GlobalScholar acquisition; the complaint never mentions the Limited Guarantee or its restrictions on where, how, by whom, and for what Raman may be sued, including Scantron's covenant that neither it nor Harland Clarke would sue except for "claims by the Guaranteed Party against the Guarantor under and in accordance with this Guarantee." (*See generally* Am. Compl. ¶¶ 35-77; Limited Guarantee § 6(b)).  The nature of the claims that plaintiffs have made is confirmed by the Order of the transferring court: "Plaintiffs state that this is not a lawsuit between the parties to the contracts about the contracts, and that Plaintiffs do not allege breach of contract or base their right to recover on the terms of the contract. … Plaintiffs argue that they are 'not specifically challenging Kal Raman's performance under his Limited Guarantee.' … ***The basis for all of Plaintiffs' claims is alleged misrepresentations that induced Plaintiffs*** to enter into the … sale of GlobalScholar to Plaintiffs." (Order at 10-12).

The transferring court concluded nonetheless that Scantron's claims against Raman "arise out of or relate to the Guarantee or the transaction contemplated thereby," and correspondingly that "the plain language of the Transaction Documents evidences the parties' intent that whatever claims were brought by Scantron or its Affiliates (including Harland Clarke) against Raman …, those claims would be brought only 'under and in accordance with [the] Guarantee' … and subject to the limitations described therein." (Order at 13,16).  As to the question of whether the

contracts ultimately bar plaintiffs' claims as a matter of Delaware law, the transferring court

thought it best to leave that matter for resolution by this court.  (*See* Order at 16).

## IV.   ARGUMENT[4]

### A.   Standard of Review

"Under Delaware law, the interpretation of contract language is treated as a question of

law," *Emmons v. Hartford Underwriters Ins. Co.*, 697 A.2d 742, 745 (Del. 1997), and "Delaware

courts are obligated to confine themselves to the language of the document and not to look to

extrinsic evidence to find ambiguity," *O'Brien v. Progressive Northern Ins. Co.*, 785 A.2d 281,

289 (Del. 2001).  Had plaintiffs attached to the complaint the operative agreements that defined

the transaction, the substance of this motion likely would have been brought as a motion to

dismiss.  *See* F.R.C.P. 12(b)(6).  However, it is now clear from plaintiffs' assertions and the

Order that there is no dispute as to the applicability of the Transaction Documents, so prompt

summary judgment is appropriate to avoid the cost and disruption of additional litigation.

F.R.C.P. 56(a); *see also Warner Theatre Assocs. Ltd. P'Ship v. Metro. Life Ins. Co.*, 149 F.3d

134, 137 (2d Cir. 1998) (noting that disclaimers are intended to avoid lawsuits, "or at least

lawsuits that cannot be quickly dismissed") (Winter, C.J.).

### B.   The Limitations That Bar This Action Found In Sections 1, 6 And 10 Of The Limited Guarantee Are Legal, Valid And Enforceable

The transferring court already concluded that plaintiffs' claims against Raman "arise out

of or relate to the Guarantee or the transaction contemplated thereby," and therefore "the plain

language of the Transaction Documents evidence the parties' intent that whatever claims were

---

[4] Due to space limitations, this brief focuses on the manner in which certain aspects of the Transaction Documents described herein forbid and defeat plaintiffs' claims universally. Raman does not concede that the claims or causes of action set forth in the Amended Complaint state a claim or are otherwise permissible.

brought by Scantron or its Affiliates (including Harland Clarke) against Raman …, those claims would be brought only 'under and in accordance with [the] Guarantee' … and subject to the limitations described therein." (Order at 13, 16).[5]

The "limitations described therein" include a covenant not to sue the Guarantor (Raman) except under and in accordance with the Limited Guarantee, and an acknowledgement by Scantron (and "its Affiliates and representatives")[6] that suing "*under and in accordance with this Guarantee*" was the "*the sole and exclusive remedy … in respect of any liabilities or obligations arising under, or in connection with, the Purchase Agreement or any of the other agreements contemplated thereby, or the transactions contemplated thereby ….*" (Limited Guarantee § 6(b)). A careful review of the Complaint and Amended Complaint confirms that plaintiffs do not assert any claims under and in accordance with the Guarantee. However, the Court need not re-visit the pleadings to confirm that; thankfully, plaintiffs confirmed that fact to the transferring court. (Order at 10-12; Doc. 31 filed 10/21/13 (Pltfs' Opp. To Transfer) at 9). Reinforcing the no-recourse provisions, section 10(b) of the Limited Guarantee terminates whatever recourse plaintiffs may have had against Raman when, among other things, the Guaranteed Party (Scantron) asserts the Guarantor (Raman) is liable other than under the Guarantee or in excess of any of the Caps. (Limited Guarantee § 10(b)). Plaintiffs triggered the

---

[5] The transferring court expressly rejected plaintiffs' position that their "lawsuit is not … about the contracts" to avoid transfer. (Doc. 31 filed 10/21/13 (Pltfs' Opp. To Transfer) at 9). "The law of the case doctrine constrains this Court from reconsidering issues already litigated in a coordinate district court." *Organ v. Byron*, 435 F. Supp. 2d 388, 390 (D. Del. 2006) (Farnan, J.).

[6] In addition, the only party permitted to sue under and in accordance with the Limited Guarantee is the "Guaranteed Party," Scantron. Indeed, Scantron expressly represented that it was buying "for its own account." (SPA § 4.06). The claims of Scantron's parent/co-plaintiff Harland Clarke thus fail under these provisions, and the definitions of the Limited Guarantee, among the other reasons set forth herein.

protections provided to Raman under section 10(b) by, at a minimum, asserting proscribed theories of liability and suing Raman for more than 100% of the GlobalScholar purchase price, rather than 5.2% (or less) pursuant to the Caps.  Plaintiffs have also triggered the protections of section 10(b) by "assert[ing]" in this "litigation" that restrictions of Limited Guarantee sections 1, 6 and 10  are "unenforceable," having stated that these are "in all events unenforceable as a matter of law." (*Compare* Limited Guarantee § 10(b) *with* Joint Status Report at 3 (Doc. 92 filed 6/13/14)).

Scantron agreed that it would not sue Raman as it has done in this litigation.  The question before the court is whether that agreement is legal, valid and enforceable under Delaware law.  The answer to that question is yes; Scantron is a sophisticated party who was represented by counsel, and it may not renege on its agreements, even when alleging extra-contractual fraud.

Under Delaware law, sophisticated parties, such as plaintiffs, are bound by the agreements that they make.  *E.g.*, *MBIA*, 426 F.3d at 220 (affirming summary judgment based on company's contractual waiver of fraudulent inducement); *Progressive Int'l,* 2002 Del. Ch. LEXIS 91, *22 ("presumption that parties will be bound by the language of the contracts they negotiate holds even greater force when, as here, the parties are sophisticated entities that bargained at arm's length."); *cf. One-O-One,* 848 F.2d at 1287 (if plaintiffs were allowed to use antecedent representations or nondisclosures to defeat clear agreement, "contracts would not be worth the paper on which they are written.").  Then-Judge Alito wrote for the Third Circuit in 2005 that "[t]he District Court recognized that some authority had looked askance at broad waivers in adhesive form agreements but predicted that the Delaware Supreme Court would enforce an unambiguous waiver negotiated by sophisticated parties. We agree."  *MBIA*, 426 F.3d

at 214.  The Third Circuit's prediction was correct; subsequent decisions confirm that Delaware

law permits sophisticated parties to contract against claims of extra-contractual fraud.

In *RAA Management, LLC v. Savage Sports Holdings*, 45 A.3d 107 (Del. 2012) (Holland,

J.), the plaintiff argued that its claims for fraud were not extinguished by contract language that it

argued was too general to effect that result.  Rejecting that argument, the Delaware Supreme

Court wrote that "The Court of Chancery rejected that argument in *Great Lakes* [*Chem. Corp. v.

Pharmacia Corp.*, 788 A.2d 544 (Del. Ch. 2001) (Jacobs, V.C.)] and *In re IBP* [*Inc. S'holders

Litig.*, 789 A.2d 14 (Del. Ch. 2001) (Strine, V.C.)] … [Plaintiff] acknowledged that …

[defendant] would have no liability, and could not be sued, for any allegedly inaccurate or

incomplete information provided … during the due diligence process."  *RAA*, 45 A.3d at 115.

In *RAA Management*, the Delaware Supreme Court cited *Warner Theatre Associates v.

Metropolitan Life Insurance*, 149 F.3d 134, 137 (2d Cir. 1998), and explained that, in affirming

then-Judge Sotomayor's decision, the Second Circuit recognized policy rationales supported by

Delaware law: "[a] party's use of ... disclaimers in negotiation agreements is intended not only to

avoid liability if the negotiations fail but also to avoid lawsuits, or at least lawsuits that cannot be

quickly dismissed.  The rule [the plaintiff] presses would essentially negate such disclaimers by

allowing naked allegations of prior oral assurances to trump at the pleading and summary

judgment stage even the most explicit disclaimer in a negotiation agreement." *RAA*, 45 A.3d at

118.  Under Delaware law, "contractual choices are respected" and must be enforced.  *GRT, Inc.

v. Marathon GTF Tech., Ltd.*, 2011 Del. Ch. LEXIS 99, *41 (Del. Ch. July 11, 2011) (Strine, C.).

In *Related Westpac LLC v. JER Snowmass LLC*, 2010 Del. Ch. LEXIS 158, *23 (Del. Ch.

July 23, 2010) (Strine, V.C.), an agreement spelled out plaintiff Related's sole remedy.  In that

situation, "what Related cannot do is avoid its own express contractual promise about the remedy

-14-

that would exclusively govern these situations." *Id*. at 22-23.  The court therefore dismissed plaintiff's claims as inconsistent with the agreement. *Id*. at 27-28; *see also ABRY Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1064 (Del. Ch. 2006) (contract provisions may defeat extra-contractual fraud claims) (Strine, V.C.).

Through the Limited Guarantee, Plaintiffs obtained valuable rights of recovery from Raman, in exchange for which plaintiffs agreed to limit the universe of possible relief available to them.  Scantron agreed that its "sole and exclusive remedy" was Raman's "maximum" liability under, and pursuant to, the Guarantee. (Limited Guarantee §§ 1, 6(b)).  The court should not re-allocate the risks of an unchallenged contract long after the fact.[7]  As a matter of fairness[8] and sound policy,[9] plaintiffs should not be allowed to circumvent the contractual limitations to which they knowingly agreed.

---

[7] *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) (court must not "appease a party who later wishes to rewrite a contract he now believes to have been a bad deal.  Parties have a right to enter into good and bad contracts, the law enforces both.") (Steele, C.J.); *Great-West Investors LP v. Thomas H. Lee Partners, L.P.*, 2011 Del. Ch. LEXIS 6, *24 (Del. Ch. Jan. 14, 2011) (court should avoid "allocating the risk of an agreement after the fact, to suit the court's sense of equity of fairness") (Noble, V.C.); *ABRY*, 891 A.2d at 1061 (sophisticated parties can "make their own judgments about the risk they should bear and the due diligence they undertake … such parties are able to price factors such as limits on liability").

[8] "[Plaintiff] is an experienced commercial entity … had the freedom to walk away and not deal with [defendant], or to bargain for better terms, including the elimination of the integration clause … To enable [plaintiff] to proceed with its rescission claims would allow it to escape the plain language of a commercial contract it voluntarily chose to sign, and renege on a contractual promise it made to [defendant]." *Progressive Int'l*, 2002 Del. Ch. LEXIS 91, *2-4.

[9] *Aspen Advisors LLC v. United Artists Theatre Co*., 843 A.2d 697, 712 (Del. Ch. 2004) (observing "Delaware law's goal of promoting reliable and efficient corporate and commercial laws") (Strine, V.C.); *NACCO Indus., Inc. v. Applica Inc*., 997 A.2d 1, 35 (Del. Ch. 2009) (Delaware law "upholds the freedom of contract and enforces as a matter of fundamental public policy the voluntary agreements of sophisticated parties.") (Laster, V.C.).

**C.** **Plaintiffs' Case Requires Them To Prove Justifiable Reliance On Material Misrepresentations, But That Is Not Possible In Light Of The Disclaimers, Affirmations, And Agreements Reflected In The Transaction Documents**

"The basis for all of Plaintiffs' claims is alleged misrepresentations that induced Plaintiffs to enter into the … sale of GlobalScholar to Plaintiffs." (Order at 11-12). Like the Limited Guarantee, the SPA contains several provisions that preclude plaintiffs' claims. The disclaimers, affirmations, and agreements in these Transaction Documents make it impossible for plaintiffs to demonstrate that they reasonably and justifiably relied upon any material misrepresentation. *Progressive Int'l*, 2002 Del. Ch. LEXIS 91, *21 ("to succeed on its claims of fraud, innocent or negligent misrepresentation, mutual mistake, and equitable estoppel, Progressive's action or inaction must have been taken in *justifiable reliance* upon promises or statements"); *Matthews Office Designs, Inc. v. Taub Investments*, 647 A.2d 382 (Del. 1994) (among other things, special relationship and reasonable reliance required to support claim for fraud by nondisclosure) (Veasey, C.J.).[10] Were the allegedly misrepresented matters material, they would have been bargained for and embodied as a representation in the contracts, rather than limited or disclaimed.

In addition to the "Complete Agreement" clause, the SPA contains several provisions which negate any claim of justifiable reliance. For example, plaintiff Scantron agreed in the SPA that it "ACKNOWLEDGES THAT THE REPRESENTATIONS AND WARRANTIES BY THE OTHER PARTIES SET FORTH IN THIS AGREEMENT AND ANY CERTIFICATE DELIVERED HEREUNDER, CONSTITUTE THE ***SOLE AND EXCLUSIVE***

---

[10] The two purported Texas statutory fraud claims (Counts I and II) were contractually superseded by the selection (in both the Limited Guarantee and the SPA) of Delaware law to govern notwithstanding any rule that would cause the law of another jurisdiction to apply. *See, e.g.*, *Market America, Inc. v. Google, Inc.*, 2011 U.S. Dist. LEXIS 42099, *8-12 (D. Del. Apr. 19, 2011) (Sleet, C.J.); *ABRY*, 891 A.2d at 1048.

*REPRESENTATIONS* AND WARRANTIES OF THE OTHER PARTIES IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY …." (SPA § 6.06(a)).  In this "all caps" provision, Scantron forthrightly affirmed that there were no extra-contractual representations in connection with the transactions.  Whether Scantron was misrepresenting the facts then or in its complaint in this litigation, its agreement that there were no extra-contractual representations shows that it would not be justified in relying on anything other than the representations contained within the SPA – which this litigation is ***not*** about.

Scantron went further, and agreed that it "UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT ALL OTHER REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE EXPRESS OR IMPLIED (INCLUDING, BUT NOT LIMITED TO, ANY RELATING TO THE FUTURE FINANCIAL CONDITION OR PROJECTIONS, RESULTS OF OPERATIONS, ASSETS OR LIABILITIES OF THE PURCHASED SUBSIDIARIES OR THEIR SUBSIDIARIES OR ANY OTHER PERSON) ARE ***SPECIFICALLY DISCLAIMED*** BY THE PARTIES." (SPA § 6.06(a)).  Section 3.21 of the SPA also contained a disclaimer of extra-contractual representations notwithstanding any delivery or disclosure to Buyer of any information with respect to the "businesses, assets, liabilities, obligations or prospects of any of the Purchased Subsidiaries or their Subsidiaries."

A disclaimer is a "renunciation of one's legal right or claim"; a renunciation is the "express or tacit abandonment of a right." *Black's Law Dictionary* at 531, 1412 (9th Ed. 2009).  Thus, Scantron specifically renounced and abandoned all extra-contractual representations, whether express or implied.  "Delaware courts have held that sophisticated parties may not reasonably rely upon representations that are inconsistent with a negotiated contract …." *Progressive Int'l*, 2002 Del. Ch. LEXIS 91, *23.

*DeBakey Corp. v. Raytheon Service Co.*, 2000 Del. Ch. LEXIS 129 (Aug. 25, 2000)

(Jacobs, V.C.) further illustrates why it is not possible for sophisticated parties like plaintiffs to

establish justifiable reliance in these circumstances:

> RSC/Raytheon … ***has not established that its reliance on ITS's
> representations was justified***. … If it was truly important that
> RSC/Raytheon be assured that ITS had, in fact, a functioning telemedicine
> system ... ***it would have been reasonable – indeed, customary – for
> RSC/Raytheon to insist that that assurance be expressed in the
> representations and warranties in the JV Agreement***. The absence of
> such contract protections suggests that RSC/Raytheon did not believe that
> it needed them, presumably because they had performed their own due
> diligence and were willing to accept the risk that their due diligence might
> later turn out to be inadequate.

2000 Del. Ch. LEXIS 129, *83-84.  Likewise:

> [T]he record establishes that at the very least, the ***plaintiffs knew that they
> were subject to the very real risk that RSC would rely upon the plain
> language of the written Agreement*** …. Therefore***, even if … RSC did
> make the oral representation that the plaintiffs claim, and even if the
> plaintiffs did rely upon it, their reliance was not justified***. If it was
> important for the plaintiffs … the plaintiffs should have negotiated for the
> specific inclusion of that obligation in the JV Agreement. Failing that,
> they should have  refused to sign the Agreement. The plaintiffs did
> neither.  [par.]  ***The claim that RSC … wrongfully induced the plaintiffs
> to enter the JV Agreement, accordingly, must fail***.

*Id*. at *67-68; *see also IBP*, 789 A.2d at 74 ("To the extent that a contracting party chose not to

negotiate for specific language regarding an issue, the most plausible inference is that the issue

was simply not fundamental enough to buttress a rescission claim.").  Plaintiffs explicitly have

not sued for breaches of the numerous representations and warranties that were actually

bargained for and obtained in the SPA.  Since those are the only representations and warranties

on which reliance might be justified, plaintiffs' claims fail.

In *Progressive International*, the plaintiff sought to avoid the limitations imposed by a

contract.  Like Scantron, *see* Limited Guarantee section 14 and SPA section 11.3, "[w]hen it

-18-

signed the Agreement, [plaintiff] averred that it had read all its terms and agreed to all its provisions, including the provision stating it was not relying upon any representations outside the four corners of the contract." *Progressive Int'l,* 2002 Del. Ch. LEXIS 91, *33-34.  The Delaware Court of Chancery would not allow plaintiff to pursue its fraud claims.  "If [plaintiff] is allowed to proceed with its fraudulent inducement claims, it will be released from its own breach of the License Agreement, a result that is unreasonable and that creates a troubling precedent for commercial parties forging future contracts.  By contrast, if [plaintiff] is expected to live up to its own words, the reasonable expectations of the parties to the License Agreement are enforced and the importance of contractual text is reinforced -- results in keeping with the public policy of this state." *Id.* at *34-35.

The no-recourse provisions and disclaimers of the Transaction Documents must be enforced.  Otherwise, Raman will be deprived of the benefit for which he provided substantial consideration, and plaintiffs will be rewarded for their own breaches of the Transaction Documents, a result that would be both unfair to Raman and, as discussed in the cases described above, bad precedent for sophisticated parties forging future contracts.

## V.    CONCLUSION

For the foregoing reasons, defendant Raman respectfully requests that the Court grant his

motion for summary judgment in his favor and against plaintiffs.


/s/ Bradley W. Voss
Edmond D. Johnson (Del. Bar No. 2257)
Bradley W. Voss (Del. Bar No. 4318)
James H. S. Levine (Del. Bar No. 5355)
Christopher B. Chuff (Del. Bar No. 5729)
PEPPER HAMILTON LLP
1313 Market Street, Suite 5100
Wilmington, DE 19899-1709
Telephone: 302.777.6500
Facsimile:  302.421.8390
johnsone@pepperlaw.com
vossb@pepperlaw.com
levinejh@pepperlaw.com
chuffc@pepperlaw.com

Dated:  July 18, 2014                    *Attorneys for Defendant Kalyanaraman Srinivasan*

27061693