# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| HARLAND CLARKE HOLDINGS CORP. and SCANTRON CORPORATION,<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL MILKEN and KALYANARAMAN SRINIVASAN,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 14-138-GMS

**REDACTED PUBLIC VERSION
filed on August 25, 2014**

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

*Of Counsel*:

Gregory P. Joseph
Mara Leventhal
Gregory O. Tuttle
Michael P. Richter
JOSEPH HAGE AARONSON LLC
485 Lexington Avenue, 30th Floor
New York, NY 10017
(212) 407-1200
gjoseph@jhany.com
mleventhal@jhany.com
gtuttle@jhany.com
mrichter@jhany.com

SEITZ ROSS ARONSTAM & MORITZ LLP
Collins J. Seitz, Jr. (#2237)
David E. Ross (#5228)
Benjamin J. Schladweiler (#4601)
100 S. West Street, Suite 400
Wilmington, DE 19801
(302) 576-1600
cseitz@seitzross.com
dross@seitzross.com
bschladweiler@seitzross.com

*Counsel for Plaintiffs Harland Clarke
Holdings Corp. and Scantron Corporation*

Dated: August 18, 2014

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. ii

NATURE AND STAGE OF THE PROCEEDINGS ................................................. 1

SUMMARY OF ARGUMENT .............................................................................. 3

STATEMENT OF FACTS .................................................................................... 5

ARGUMENT ..................................................................................................... 9

    I.     THE SPA INTENTIONALLY LEAVES FRAUD CLAIMS UNFETTERED ............................ 10

    II.    THE GUARANTEES' NO-RECOURSE PROVISIONS DO NOT BAR PLAINTIFFS' CLAIMS ... 11

        A.    Plaintiffs' Claims Are Unrelated to the Guarantees and All Duties and Liabilities Imposed on Guarantors by the Guarantees .................................... 12

        B.    Milken Is Not a Non-Recourse Party Here, Rendering the Covenant Not to Sue Inapplicable .............................................................................. 13

        C.    Plaintiffs' Claims Against Raman Do Not Breach Any "Cap" ...................... 19

        D.    Claims Against Raman Do Not Assert "Proscribed" Theories of Liability ..... 21

        E.    Even if the Claims Against Milken and Raman Were Somehow Proscribed, Filing Suit Terminated the Guarantees *Ab Initio*, Erasing Any Contractual Bar to Suit .............................................................................. 21

        F.    Section 6(b) Is Not Only Inapposite but, If Read to Bar Fraud Claims, Unenforceable .............................................................................. 23

    III.    PLAINTIFFS' CONTRACTUAL DISCLAIMERS ARE NOT ANTI-RELIANCE CLAUSES ......... 25

CONCLUSION ................................................................................................. 29

i

## <u>TABLE OF AUTHORITIES</u>

Page

### Cases

*Abry Partners V, L.P. v. F&W Acquisition, LLC*,
    891 A.2d 1032 (Del. Ch. 2006)..................................................................10, 24-25, 26 n.17

*Airborne Health, Inc. v. Squid Soap, LP*,
    984 A.2d 126 (Del. Ch. 2009)........................................................................................5, 27

*Alltrista Plastics, LLC v. Rockline Indus.*,
    C.A. No. N12C-09-094 JTV, 2013 WL 5210255 (Del. Super. Ct. Sept. 4, 2013) ......27-28

*Anvil Holding Corp. v. Iron Acquisition Co.*,
    C.A. Nos. 7975-VCP, N12C-11-053-DFP [CCLD],
    2013 WL 2249655 (Del. Ch. May 17, 2013)............................................................5, 26, 28

*Comrie v. Enterasys Networks, Inc.*,
    C.A. No. 19254, 2004 WL 293337 (Del. Ch. Feb. 17, 2004).............................................10

*Cont'l Ill. Nat'l Bank & Trust Co. v. Hunt Int'l Res. Corp.*,
    C.A. Nos. 7888, 7844, 1987 WL 55826 (Del. Ch. Feb. 27, 1987)....................................24

*DeBakey Corp. v. Raytheon Serv. Co.*,
    C.A. No. 14947, 2000 WL 1273317 (Del. Ch. Aug. 25, 2000)...........................26-27 n.17

*Fagan v. City of Vineland*,
    22 F.3d 1283 (3d Cir. 1994)........................................................................................19 n.12

*Geyer v. Ingersoll Publ'ns Co.*,
    621 A.2d 784 (Del. Ch. 1992)...........................................................................................24

*Great Lakes Chem. Corp. v. Pharmacia Corp.*,
    788 A.2d 544 (Del. Ch. 2001).........................................................................26-27 n.17

*Homan v. Turoczy*,
    C.A. No. 19220, 2005 WL 2000756 (Del. Ch. Aug. 12, 2005)................................26 n.17

*Kleinwort Benson N. Am., Inc. v. Quantum Fin. Servs. Inc.*,
    285 Ill. App. 3d 201, 673 N.E.2d 369 (1996),
    *aff'd*, 181 Ill. 2d 214, 692 N.E.2d 269 (1998) ........................................................... 10-11

*Kronenberg v. Katz*,
    872 A.2d 568 (Del. Ch. 2004)............................................................................... 25-26, 27

*L.P.P.R., Inc. v. Keller Crescent Corp.*,
532 Fed. App'x 268 (3d Cir. 2013)........................................................................9

*Lambert v. Blackwell*,
387 F.3d 210 (3d Cir. 2004)........................................................................19 n.12

*Leeseberg v. Converted Organics Inc.*,
C.A. No. 08-926-GMS, 2011 WL 825725 (D. Del. Mar. 3, 2011).......................9

*Lincoln Nat'l Life Ins. Co. v. Joseph Schlanger 2006 Ins. Trust*,
28 A.3d 436 (Del. 2011) ............................................................................. 22-23

*Mabon, Nugent & Co. v. Tex. Am. Energy Corp.*,
C.A. No. 8578, 1988 WL 5492 (Del. Ch. Jan. 27, 1988)...................................24

*Marino v. Cross Country Bank*,
C.A. No. 02-65-GMS, 2003 WL 503257 (D. Del. Feb. 14, 2003) ...............28 n.18

*MBIA Ins. Corp. v. Royal Indem. Co.*,
426 F.3d 204 (3d Cir. 2005)...................................................................... 26-27 n.17

*OpenGate Capital Grp. LLC v. Thermo Fisher Scientific Inc.*,
No. 13-1475-GMS, 2014 WL 3367675 (D. Del. July 8, 2014) ....................28 n.18

*Overdrive, Inc. v. Baker & Taylor, Inc.*,
C.A. No. 5833-CC, 2011 WL 2448209 (Del. Ch. June 17, 2011).....................28

*Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*,
C.A. No. 19209, 2002 WL 1558382 (Del. Ch. July 9, 2002) ...................... 26-27 n.17

*RAA Mgmt., LLC v. Savage Sport Holdings, Inc.*,
45 A.3d 107 (Del. 2012) .............................................................................26 n.17

*St. James Recreation*, LLC v. Rieger Opportunity Partners LLC*,
C.A. No. 19346, 2003 WL 22659875 (Del. Ch. Nov. 5, 2003)...................... 26-27 n.17

*Tek Stainless Piping Products, Inc. v. Smith*,
C.A. No. N13C-03-175 MMJ CCLD,
2013 WL 5755468 (Del. Super. Ct. Oct. 14, 2013) ..........................................27

*Transdigm Inc. v. Alcoa Global Fasteners, Inc.*,
C.A. 7135-VCP, 2013 WL 2326881 (Del. Ch. May 29, 2013) .................26 n.16

*Wilson Arlington Co*. v. *Prudential Ins. Co.*,
912 F.2d 366 (9th Cir. 1990) .......................................................................2 n.2

*Wishkin v. Potter*,
476 F.3d 180 (3d Cir. 2007)................................................................................................9

## NATURE AND STAGE OF THE PROCEEDINGS[1]

Plaintiffs Scantron Corporation ("**Scantron**" or "**Buyer**") and Harland Clarke Holdings Corporation ("**Harland Clarke**") claim that Defendants Michael Milken ("**Milken**") and Kalyanaraman Srinivasan ("**Kal Raman**" or "**Raman**") fraudulently induced Scantron's $135 million acquisition of "**GlobalScholar**," an educational software business (the "**Transaction**"). Neither Defendant was a party to the Transaction.  Raman was GlobalScholar's founder and CEO.  (¶8; KR Ans. ¶8; ▮▮▮▮).  Milken was Chairman of KUE Management Inc., the General Partner of Knowledge Universe Education LP ("**KUE**"), a limited partnership that owned a majority interest in GlobalScholar's parent, KUE Digital International LLC ("**Digital**" or "**Seller**"). (MM Ans. ¶¶7, 14; ▮▮▮▮; Maron ¶3; KUE Guarantee).

Because Defendants chose to file summary judgment motions asserting purported contractual defenses before discovery has begun in earnest, the factual allegations of the FAC (which have never been challenged) provide the backdrop, and those allegations are stark. Critically, Defendants convinced Plaintiffs that GlobalScholar's feature product was a comprehensive, completely integrated system that was outperforming competitors (¶¶8, 18, 20, 23-25), when, in fact, the product was mere vaporware—software that appeared to be robust but was nothing more than a mirage (¶31).  Not only did Defendants know these statements were

---

[1]     Abbreviations:  "**Ex.**" means exhibits to the accompanying Declaration of Gregory O. Tuttle ("**Tuttle ¶**"); "**¶**" refers to Plaintiffs' First Amended Complaint (D.I. 26) ("**FAC**"); "**MM Br.**" denotes Milken's Opening Brief in Support of his Motion for Summary Judgment (D.I. 102); "**KR Br.**" means Raman's Opening Brief in Support of his Motion for Summary Judgment (D.I. 100); "**MM Ans.**" means Milken's Answer (D.I. 66); "**KR Ans.**" means Raman's Answer (D.I. 67); "**Maron ¶**" and "**Maron Ex.**" refer to the Declaration of Stanley Maron filed September 30, 2013 (D.I. 18-2); "**Kyman ¶**" and "**Kyman Ex.**" refer to the Declaration of David S. Kyman in Support of Milken's Motion (D.I. 102-1); the **Guarantees** are, collectively, the Raman Limited Guarantee (D.I. 100-2), KR Br. Ex. B ("**Raman Guarantee**"); KUE L.P. Guarantee (D.I. 102-2), Kyman Ex. A ("**KUE Guarantee**"); Ignition Venture Partners III, LP Limited Guarantee (D.I. 18-2) Maron Ex. F ("**Ignition I Guarantee**"); and Ignition Managing Directors Fund III Limited Guarantee (D.I. 18-3), Maron Ex. G ("**Ignition II Guarantee**") (together, the Guarantees and SPA are the "**Transaction Documents**"); "**§**" refers to provisions in the Guarantees, which are substantially identical with one irrelevant variation.  Emphasis is added to, and internal citations, quotations and brackets are omitted from, quotations in this brief unless otherwise indicated.

1

false, but Defendants also falsely assured Plaintiffs they could count on Houghton Mifflin Harcourt Publishing Company ("HMH"), a major customer, to supply a long-term contribution to GlobalScholar's earnings because, after the deal closed, Milken would exert his substantial financial influence on HMH to do so; in fact, HMH abandoned GlobalScholar shortly after the closing (¶¶9, 21, 26-28, 33-34).

As a basis for their supposed contractual defenses, Defendants pluck out of context language from the Securities Purchase Agreement ("**SPA**") (KR Br. Ex. C) between Scantron and Digital (the only signatories) and the Limited Guarantees executed by Raman and three of Digital's primary equity holders, one of which (KUE LP) was controlled by Milken. These Transaction Documents, however, were carefully drafted so as to *allow* claims for intentional fraud against non-signatories to the SPA, like Raman and Milken. This is not news to Defendants— ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████. Perhaps it is to avoid disclosing similar documents in discovery that Defendants insisted on filing summary judgment motions before discovery has significantly progressed.

Defendants' textual arguments cannot withstand analysis. Neither Defendant grapples with the dispositive contractual language. Instead, each hides behind misleading suggestions that determinative issues were already decided in their favor by the transferring court. *See* MM Br. 13 ("Judge Rodriguez determined that plaintiffs' claims of fraud … were subject to the limitations of the Agreements."); KR Br. 11-12. In reality, Judge Rodriguez <u>refused</u> to decide "whether the Transaction Documents … bar Plaintiffs' claims against Milken" and expressly left "those issues … for the Court that will be deciding the merits." Transfer Order at 16.

Plaintiffs agree that the Transaction Documents are unambiguous—the relevant provisions are technical and complex, but they are not unclear.[2] There is no contractual bar to

---

[2] "The test for ambiguity is not complexity, but lack of clarity." *Wilson Arlington Co*. v. *Prudential Ins. Co.*, 912 F.2d 366, 371 (9th Cir. 1990).

2

Plaintiffs' claims.  If the Court were to detect any ambiguity, however, that also would defeat Defendants' summary judgment motions because all inferences must be drawn in Plaintiffs' favor as the non-moving parties.  Either way, Defendants' motions should be denied.

## SUMMARY OF ARGUMENT

1.      The SPA explicitly carves out of its "Limitation on Recourse" provision (SPA §8.09) fraud claims against "any officer, director, partner, member or employee (present or former) of Seller," and even excludes "intentional fraud" claims from limitations imposed by the SPA's indemnification procedures (SPA §8.07).

2.      The claims in the FAC do not transgress any provision in the Guarantees.  The Guarantees cover only "Obligations," and none of Plaintiffs' claims implicates any of the guaranteed "Obligations."  The Obligations consist exclusively of Seller payment and indemnification obligations in the SPA, such as the Seller's obligation to pay pre-closing taxes (SPA §6.02(a)), and to indemnify Buyer for losses caused by Seller's breach of representations, warranties, or covenants (SPA §8.02(a)).  There is no Seller obligation to indemnify Plaintiffs' losses for Defendants' fraudulent inducement of the Transaction.  Because none of the Seller payment or indemnification obligations affect or are affected by the redress Plaintiffs seek here, there is no connection between Plaintiffs' claims and indemnified Obligations, and the Guarantees are not implicated by this suit.

3.      None of the Guarantee provisions bars the claims in the FAC for another, independent reason.  ███████████████████████████████████████████████████████

███████████████████████████████████████████.  The Guarantors insisted on getting something in return for issuing the Guarantees—namely, the comfort that their Guarantees would evaporate *ab initio* if any of them were sued for more than the amount they guaranteed (the "Caps").  That structure gives the Guaranteed Party a strong incentive not to sue a Guarantor for more than the amounts guaranteed, but that means that it also contemplates a suit outside the limitations of the Guarantees and does not bar one.  The Guarantees present the Guaranteed Party (Scantron) with a choice—either it can have the benefit of the Guarantees, or it can sue a

Guarantor (Raman) or a Guarantor's affiliate (Milken) for more than they guaranteed.  If Scantron chose the latter course, as Defendants argue it has by filing the FAC, then the Guarantees—including their covenant not to sue—evaporate "*ab initio*." ████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████.  That is what Defendants got. Therefore, even if Defendants were correct that Plaintiffs' claims in the FAC breached the limits of the Guarantees (they are not), the sole consequence—precisely as the parties intended—is termination of the Guarantees *ab initio* and retroactive elimination of the covenant not to sue.

      4.     Milken's reliance on the KUE Guarantee's covenant not to sue also fails because it depends on his status as a "Non-Recourse Party," and he does not have any status as a Non-Recourse Party in this action.  A Guarantor affiliate like Milken is a Non-Recourse Party only if and to the extent that a Guaranteed Party asserts against him a "remedy, recourse, or right … with respect to this Guarantee" (§6(a)).  Plaintiffs do not assert claims with respect to the Guarantee because, as noted, their claims do not implicate guaranteed Obligations.  Milken admits this (MM Br. 9-10).  Under the plain language of the KUE Guarantee (§§6(a)-(b)), the covenant not to sue is inapplicable where, as here, the Guarantor affiliate is <u>not</u> a Non-Recourse Party because no claim is asserted against him "<u>with respect to the Guarantee</u>."

      5.     Raman does not specify which of the FAC's "theories of liability" are supposedly "proscribed" by the Guarantee (KR Br. 13).  Only one provision of the Guarantee addresses permissible "theor[ies] of liability … against the Guarantor"—and it deliberately leaves intact all theories of fraud "other than" fraud "<u>with respect to the Obligations</u>" (§10(b)(iii)).  The FAC does not assert a claim of fraud with respect to the Obligations.  Hence, this argument, too, fails.

      6.     Raman's argument that Plaintiffs' claims "violate" the Guarantee's "liability cap" (KR Br. 2) is equally hollow.  The Guarantee provision only limits his liability "<u>under the Guarantee</u>."  These limits are defined solely in terms of the guaranteed Obligations (§1), none of which is implicated by this suit.  Indeed, Raman admits that the fraud claims against him are

unrelated to the Obligations and any performance under the Guarantee. *See* KR Br. 10 ("All of Plaintiffs' 'counts' are based on theories of fraud or misrepresentation to induce plaintiffs to enter into the GlobalScholar acquisition; the complaint never mentions the Limited Guarantee….").

7.      Assuming, *arguendo*, that Defendants were right and that the Guarantee's "No Recourse" provisions, including the covenant not to sue, barred Plaintiffs' fraud claims, those provisions would be unenforceable under Delaware public policy precluding enforcement of contractual provisions, including no-recourse clauses, that bar claims of intentional fraud.

8.      Both Defendants scour the SPA for "affirmative[] disclaim[ers of] reliance on the extra-contractual alleged representations on which plaintiffs now sue" (MM Br. 13; KR Br. 2), but they cannot find any.  Two of the disclaimers (SPA §§3.21, 6.06) consist of <u>Seller</u> disclaiming extra-contractual representations, and doing so in language Delaware Courts routinely reject as insufficient to "reflect a clear promise by the Buyer that it was not relying on statements made to it outside of the Agreement." *Anvil Holding Corp. v. Iron Acquisition Co.*, C.A. Nos. 7975-VCP, N12C-11-053-DFP [CCLD], 2013 WL 2249655, at *8 (Del. Ch. May 17, 2013) (examining provisions equivalent to §§3.21 and 6.06).   The third (SPA §11.08) is "a standard integration clause [that] defines the parties' agreement [but] does not disclaim reliance." *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 141 (Del. Ch. 2009).  There is no clause in the SPA barring Plaintiffs from relying on fraudulent statements by non-signatories like Raman and Milken, and that is all that this lawsuit is about.

<u>**STATEMENT OF FACTS**</u>

**GlobalScholar.**  When discussion of a potential acquisition began in the fall of 2010, GlobalScholar was an ostensible provider of enterprise resource-planning systems to school districts across the U.S. ████████ ).  The business had been founded in 2006 by Kal Raman, who was its CEO, a director of GlobalScholar entity KUE Digital Inc. ("Digital Inc.") and its parent, Digital (the Seller), and who is identified in the SPA as GlobalScholar's "Key Employee" (¶8; KR Ans. ¶8; ████████ ; SPA §10.01).  GlobalScholar was a majority-owned subsidiary of

5

KUE, "the primary vehicle through which the global education company known as 'Knowledge Universe' makes investments in for-profit companies engaged in the business of Pre-K through 12th grade education of children" (KUE Guarantee §5(f); ███████). KUE was a holding company that acts through its general partner, KUE Management, Inc. (Maron ¶3). Milken, who "has 30 years of experience in the education field," was an equity holder and Chairman of KUE Management, Inc., and served as a director of Digital and Digital Inc. (MM Ans. ¶¶9, 14; FAC Ex. A at 6; FAC Ex. C at 4; MM Br. 10; Kyman ¶3; ████).

**Defendants' Misrepresentations and Omissions.** Defendants' early summary judgment motions are based on purely contractual defenses, and in-depth discovery regarding the Defendants' underlying frauds has only just begun. Documentary evidence developed to date, however, shows that during the fall of 2010 Defendants convinced Scantron that GlobalScholar's feature product, the Pinnacle suite of educational software, was a comprehensive and completely integrated system that was outperforming competitors (FAC Exs. A, B, C). As the FAC alleges and as Plaintiffs expect discovery to further demonstrate, these representations were false, misleading and incomplete (¶31). Defendants represented that Pinnacle was "best of breed" and "best in class" among its competitors (FAC Ex. A at 12; FAC Ex. B at 15). But, at the time it made these representations, GlobalScholar had been experiencing serious difficulty fully integrating its platform and was selling customers capabilities that did not exist (¶32).





Milken attributed GlobalScholar's bogus achievements to Raman (¶19, MM Ans. ¶19) and insisted that Raman remain with the company to ensure its future success (¶¶19, 22)—something that mattered to Milken because Raman could continue to cover up the fraud.  Milken also claimed he could assure a long-term contribution by GlobalScholar's major customer, HMH, to GlobalScholar's earnings because Milken was represented on HMH's board, his companies owned a substantial amount of HMH debt, and he could exert significant influence on HMH's management (¶¶9, 21, 26-28; MM Ans. ¶9).  Yet, HMH exited the relationship with GlobalScholar not long after the transaction (¶33).

**The Transaction**.  The SPA, dated as of December 15, 2010, memorializes Scantron's purchase of all of the capital stock of three entities that held the GlobalScholar business—Digital Inc., KUED Sub I LLC, and KUED Sub II LLC (SPA Preamble; ¶¶12, 30; MM Ans. ¶¶12, 30; KR Ans. ¶¶12, 30).  In pertinent part, the SPA contains provisions that "representations and warranties by the other parties … constitute the sole and exclusive representations and warranties of the other parties" (SPA §6.06; *see also* SPA §3.21), but it lacks any language disclaiming reliance on extra-contractual representations, and its "Exclusive Remedy" and "Limitation on Recourse Provisions" expressly permit claims for intentional fraud.  *See* SPA §8.07 (excluding "any claims that arise from intentional fraud" from the "exclusive remedy" limitation); SPA §8.09 ("Other than … arising from intentional fraud, no claim shall be brought…").

The Transaction closed on January 3, 2011, and the Guarantees were

executed on or about that date (Maron ¶¶8, 10, 11; Guarantees).

**The Guarantees.** 



The Guarantees provide that each Guarantor, up to his or its Pro Rata

Portion,

> absolutely, unconditionally and irrevocably guarantees to the Guaranteed Party the due and punctual observance, performance and discharge of all of the payment and indemnification obligations of Seller under the Purchase Agreement (including any such obligations that arise as a result of the non-performance by Seller of its obligations under the Purchase Agreement) (such obligations, the "Obligations").

(Guarantee §1).[3]  Each Guarantee provides that it "shall terminate *ab initio* and be null and void"

if "the Guaranteed Party … asserts any theory of liability against the Guarantor or any Non-

Recourse Party with respect to Obligations other than" certain enumerated exceptions.  (§10(b)).

The Guarantees also contain a non-recourse provision which limits rights of recovery "with

respect to this Guarantee" against certain Guarantor affiliates (§6(a)).

**Plaintiffs' Claims.**  After the Transaction closed, Plaintiffs learned over time that

Defendants' technical presentations were false and deceptive, not accurate representations of the

state of GlobalScholar's technology (¶31).  Much of GlobalScholar's software was "'vaporware'

(*i.e.*, software that appears to be robust and fully functioning, but that is no more than a mirage

… not capable of functioning as an integrated suite);" GlobalScholar "was not prepared to

service or capable of delivering contracted requirements;" and Raman was incompetent (¶¶31-

33).  The CEO of HMH, whom Milken had introduced to Plaintiffs as a confidant, left HMH

---

[3]    The Pro Rata shares were proportional to each Guarantor's economic interest in the Seller.  KUE guaranteed 83.9%, Ignition I 10.6%, Ignition II 0.3%, and Raman 5.2%.  (§1(c); Maron ¶8).

soon after the transaction closed and HMH then abandoned GlobalScholar (¶¶10, 33-34; MM Ans. ¶33; KR Ans. ¶33).  The FAC seeks damages for intentional common law fraud (Count III), intentional fraud by nondisclosure (Count IV), negligent misrepresentation (Count V), aiding and abetting fraud (Count VI), and conspiracy (Count VII).[4]

       **Procedural History**.  On June 17, 2013, Plaintiffs, through predecessor counsel, commenced litigation against Defendants and others in Texas state court alleging claims sounding in fraud (D.I. 1-1).  On August 13, 2013, Defendants removed the case to the United States District Court for the Western District of Texas (D.I. 1).  Plaintiffs filed the FAC on October 11, 2013 (D.I. 26).  On February 4, 2014, Judge Xavier Rodriguez of the Western District of Texas ordered transfer to this Court.  In doing so, Judge Rodriguez expressly declined to "decide whether the Transaction Documents … bar Plaintiffs' claims against Milken, and those issues are properly left for the Court that will be deciding the merits."  Transfer Order at 16.  On February 26, 2014, Defendants filed their Answers to the FAC (D.I. 66, 67).  At Defendants' request, the Scheduling Order required that summary judgment motions be filed by July 18, 2014, over a year before the scheduled completion of discovery (D.I. 95 ¶6 and Ex. A).

## ARGUMENT

       On these motions, all inferences are to be drawn in Plaintiffs' favor:  "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor."  *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007); *Leeseberg v. Converted Organics Inc.*, C.A. No. 08-926-GMS, 2011 WL 825725, at *3 (D. Del. Mar. 3, 2011) (Sleet, J.).  The parties agree that the contractual provisions at issue are unambiguous but, should the Court nonetheless perceive any ambiguity, it must deny summary judgment.  *See, e.g.*, *L.P.P.R., Inc. v. Keller Crescent Corp.*, 532 F. App'x 268, 274 (3d Cir. 2013).

---

[4]    The FAC also pleads violations of the Texas Securities Act (Count I) and the Texas Business & Commerce Code (Count II), but Plaintiffs no longer press those claims.

I.      <u>THE SPA INTENTIONALLY LEAVES FRAUD CLAIMS UNFETTERED</u>

Milken argues that the SPA's "exclusive remedy" provision (SPA §8.07) bars Plaintiffs' fraud claims (MM Br. 11), but he knows this is false.  Not only is the SPA unambiguous on its face, ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████

Milken deliberately misconstrues SPA §8.07.  The provision has nothing to do with fraudulent inducement claims against non-signatories—it merely channels claims for breach of contract through the SPA's indemnification procedures.  Those procedures regulate each party's indemnification of the other for losses caused by its own breach of representations, warranties and covenants in the agreement.  *See* SPA §§8.02-8.04.  They are inapplicable to non-signatories.  *See also Comrie v. Enterasys Networks, Inc.*, C.A. No. 19254, 2004 WL 293337, at *2 (Del. Ch. Feb. 17, 2004) ("As a general rule, a nonparty to a contract has no legal right to enforce it.").  Milken does not assert any status as a third party beneficiary.

The fallaciousness of Milken's argument is underscored by the fact that SPA §8.07 is not only limited in scope to indemnification of parties, but even with respect to those parties it leaves claims for intentional fraud and willful breach unaffected by limitations of the indemnification procedures.  *See* SPA §8.07 ("[T]he provisions of this Section 8.07 shall not (x) apply to any claims that arise from intentional fraud or a Willful and Material Breach by Seller or Buyer….").  The SPA even carves fraud claims out of a provision addressing Seller affiliate liability for breach of representations, warranties, and covenants in the agreement.  *See* SPA §8.09 ("<u>Other than … arising from intentional fraud</u>, no claim shall be brought or maintained by Buyer….").  Milken's ill-conceived interpretation is also irreconcilable with the Delaware courts' "distaste for immunizing fraud."  *Abry Partners V, L.P. v. F&W Acquisition, LLC*, 891 A.2d 1032, 1060 n. 70, 1061 (Del. Ch. 2006), citing, *inter alia*, *Kleinwort Benson N. Am., Inc. v. Quantum Fin. Servs. Inc.*, 285 Ill. App.3d 201, 673 N.E.2d 369 (1996), *aff'd*, 181 Ill. 2d 214, 692 N.E.2d 269

(1998) (disallowing an exclusive remedy clause from preventing claim for rescission where company was fraudulently induced to close a transaction because a representation in a Stock Purchase Agreement was false as of closing).

## II.   THE GUARANTEES' NO-RECOURSE PROVISIONS DO NOT BAR PLAINTIFFS' CLAIMS

Because Raman is a Guarantor under the Raman Guarantee, and Milken is an affiliate under the KUE Guarantee, they rely on different parts of the No Recourse provisions to support arguments that Plaintiffs' claims against them are barred. Milken argues that he is a "Non Recourse Party" under a definition set forth in §6(a), and Raman relies on language in the covenant not to sue in §6(b). Both claim to be protected from the claims in the FAC by operation of the covenant not to sue found in §6(b) (the "Covenant"), which states:

> The Guaranteed Party hereby covenants and agrees that it shall not institute, and shall cause each of its Affiliates and representatives not to institute, directly or indirectly, any Action arising under, or in connection with, this Guarantee, the Purchase Agreement or the transactions contemplated thereby against the Guarantor or any Non-Recourse Party except for (i) claims by the Guaranteed Party against the Guarantor under and in accordance with this Guarantee, [or] (ii) claims by the Guaranteed Party against Seller under and in accordance with the Purchase Agreement....[5]

(§6(b)).[6] Both Defendants assert that the Covenant broadly bars "any Action arising under, or in connection with … the Purchase Agreement or the transactions contemplated thereby." (MM Br.

---

[5]   Unlike the Raman Guarantee, the KUE Guarantee adds a third type of permissible claim: "claims under and in accordance with the Restrictive Covenant Agreement," under which KUE is a "Restricted Party" required to refrain from competing with GlobalScholar or soliciting its employees or clients for specified periods (Maron ¶9 and Ex. H ("Restrictive Covenant Agreement")). This provision is not relevant on these motions.

[6]   The remainder of §6(b) states that claims against the Guarantor or Seller defined in clauses (i) and (ii) "shall be the sole and exclusive remedy of the Guaranteed Party against the Guarantor or any Non-Recourse Party in respect of any liabilities or obligations arising under, or in connection with, the Purchase Agreement or any of the other agreements contemplated thereby, or the transactions contemplated thereby" (§6(b)). This parallel "sole remedy" clause raises the same issues as the covenant not to sue (*i.e.*, the limitation to defined claims against the Guarantor or Seller, and the breadth of the scope "arising under, or in connection with, the Purchase Agreement or any of the other agreements contemplated thereby, or the transactions contemplated thereby"), so arguments made with respect to the Covenant apply equally to the "sole remedy" clause, unless otherwise indicated.

9-10; KR Br. 8). Both therefore argue that Plaintiffs should be barred by a covenant in a Guarantee from asserting fraud claims that have nothing whatsoever to do with the Guarantee. This argument is meritless.

### A.      Plaintiffs' Claims Are Unrelated to the Guarantees and All Duties and Liabilities Imposed on Guarantors by the Guarantees

Both Defendants admit that Plaintiffs' claims are unrelated to the Guarantees. *See* MM Br. 9-10 (clauses defining claims under the Guarantee in §6(b)(i)-(iii) "do <u>not</u> encompass any of plaintiffs' claims against Mr. Milken"); KR Br. 12 ("A careful review of the Complaint and Amended Complaint confirms that plaintiffs do not assert any claims under and in accordance with the Guarantee.") The fact that Plaintiffs' claims have no impact on any Guarantor's liability vitiates Defendants' reliance on purported contractual bars. A Guarantor's exposure under his or its Guarantee is limited to the guaranteed "Obligations:"

> The Guarantor (severally, and not jointly, with the Other Guarantors based on their respective Pro Rata Portions (as defined below)) hereby absolutely, unconditionally and irrevocably guarantees to the Guaranteed Party the due and punctual observance, performance and discharge of <u>all of the payment and indemnification obligations of Seller under the Purchase Agreement (including any such obligations that arise as a result of the non-performance by Seller of its obligations under the Purchase Agreement) (such obligations, the "Obligations"</u>).

(§1). Plaintiffs' fraud claims do not seek any amounts that can be characterized as Obligations.

Plaintiffs seek damages for Defendants' fraudulent inducement of their purchase of GlobalScholar. Simply put, Plaintiffs' losses caused by that fraud are not indemnified by the Seller under the SPA, and thus are not Guaranteed Obligations. The only Seller obligation to indemnify losses caused by fraud or misrepresentation is the Seller obligation to indemnify the Buyer Indemnified Parties for losses caused by the <u>Seller's</u> breach of representations, warranties, or covenants set forth in the SPA §8.02(a)(i)-(ii).[7] Neither Defendant is a "Seller" within the

---

[7]      "Representations and warranties in Article II and or III" of the SPA are "Representations and Warranties Relating to Seller" (Art. II), and "Representations and Warranties Relating to the Purchased Subsidiaries" (Art. III). "Certificates delivered by or on behalf of the Seller" under the SPA are also included (SPA §1.02 (net working capital); §1.07 (CPA certificate from India); §§7.01(k)(iii)-(iv) (subsidiaries' organizational documents, Seller's compliance with tax laws).

SPA.  *See* SPA Preamble.  Defendants' fraud is not, therefore, a fraud of the Seller.  On the

contrary, the Seller expressly disclaims all representations and warranties except for those made

by the Seller in the SPA or any certificate (SPA §6.06).  The SPA precludes liability of Seller

affiliates but only for breaches of representations and warranties in the SPA, so it could not

contemplate a Seller obligation to indemnify such liability, and it expressly permits, without

indemnifying, claims based on fraudulent extracontractual statements made by Seller affiliates.[8]

      The only other Seller payment or indemnification obligations in the SPA are obligations

to (1) indemnify claims arising from the Transaction and asserted against the Buyer by the

Seller's equity holders or affiliates (SPA §8.02(iv)); (2) pay certain taxes (SPA §§6.02(a), (g),

(p)); (3) pay any shortfall in Net Working Capital (SPA §1.04(b)(i)); (4) pay certain pre-closing

indebtedness (SPA §§1.03(c), 8.02(a)(iii)); (5) pay Seller's Transaction Expenses (SPA

§§1.03(b)(v), 8.02(a)(iii)); and (6) indemnify Buyer's losses from breach of the Restrictive

Covenant Agreement (SPA §§5.04, 7.01(j); Restrictive Covenant §3(d)).  None of these

provisions has anything to do with the claims in the FAC.

      The only potential Guarantor liability under the Guarantee, other than for the Obligations,

is liability for breach of the Guarantor's representations and warranties in §5, all of which relate

to the Guarantor's authority and financial ability to perform its obligations under the Guarantee.

Manifestly, that is also unimplicated by Plaintiffs' claims.  Accordingly, Plaintiffs' claims are

unrelated to the Guarantees, and the limitations on suit in the Guarantees is inapplicable.

### B.    Milken Is Not a Non-Recourse Party Here, Rendering the Covenant Not to Sue Inapplicable

      Milken argues that he is "protected" by the covenant not to sue in §6(b) because he is a

---

[8]     SPA §8.09 provides: "Other than … arising from intentional fraud, no claim shall be brought or maintained by Buyer … against any officer, director, partner, member or employee (present or former) of Seller, the Purchased Subsidiaries or their Subsidiaries, or any direct or indirect equity holder of Seller, and no recourse shall be brought or granted against any of them, by virtue of or based upon any alleged misrepresentation or inaccuracy in, or breach of any of the representations, warranties, covenants or agreements of Seller set forth or contained in, this Agreement or any certificate delivered hereunder."

KUE affiliate and, therefore, a Non-Recourse Party under §6(a) (MM Br. 10).  This argument is demonstrably unsound.  Section 6(a) defines Non-Recourse Party as one against whom a remedy is sought "with respect to the Guarantee."  Plaintiffs seek *no* remedy with respect to the Guarantee.  Section 6(b) limits liability that is derivative of the Seller or the Guarantor, but does not limit direct liability.  Plaintiffs do not assert such liability against Milken in the FAC.  As a result, Milken is *not* a Non-Recourse Party for purposes of this action.

The first clause of §6(a), "[w]ithout limiting any obligations of Seller under the Purchase Agreement, of Guarantor under the Restrictive Covenant Agreement or Guarantor hereunder," affirms all of the Seller's liability to the Guaranteed Party as primary obligor and all of the Guarantor's liability under the Guarantee, as secondary obligor.  In the second clause, "the Guaranteed Party agrees and acknowledges that no Person other than the Guarantor has any obligations under this Guarantee," thus acknowledging that the Guarantor's affiliates have no direct liability for the Obligations.

In the third clause, the Guaranteed Party waives all "remedy, recourse or right of recovery against" a Guarantor's affiliates, with the crucial caveat "<u>in each case, with respect to this Guarantee</u>:"

> [N]otwithstanding that the Guarantor is a limited partnership, the Guaranteed Party has no remedy, recourse or right of recovery against, or contribution from, <u>in each case, with respect to this Guarantee</u> (i) any former, current or future general or limited partners, stockholders, holders of any equity, partnership or limited liability company interest, officer, member, manager, director, employees, agents, controlling Persons, assignee or any Affiliates of the Guarantor (other than Seller), or (ii) any former, current or future general or limited partners, stockholders, holders of any equity, partnership or limited liability company interest, officer, member, manager, director, employees, agents, attorneys, controlling Persons, assignee or Affiliates (other than Guarantor) of any of the foregoing (<u>those Persons and entities described in the foregoing clauses (i) and (ii) being referred to herein collectively as "Non- Recourse Parties"</u>)

The fourth clause confirms §6(a)'s focus on derivative liability by clarifying that the Guaranteed Party's waiver of rights specifically encompasses recourse via piercing, operation of law, and other indirect methods—namely:

through the Guarantor, Seller or otherwise, whether by or through attempted piercing of the corporate veil or similar action, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any statute, regulation or applicable Law, by or through a claim by or on behalf of the Guarantor, Seller or any Purchased Subsidiary directly or indirectly against the Guarantor or any Guarantor Affiliate, or otherwise , …

But §6(a) is not a flat waiver of rights.  The fifth clause establishes a substantial carve-out from clause 3 (which defines Non-Recourse Parties and, like clause 5, uses the phrase "in each case").  In the fifth clause, the Guaranteed Party retains rights to seek redress, through recourse to the Guarantor's affiliates, for the Guarantor's unpaid Obligations, its breach of representations and warranties in the Guarantee, and its intentional fraud with respect to the Guarantee:

... except, in each case, for (v) claims against the Guarantor arising from intentional fraud by the Guarantor; provided, that any such claims shall be subject to the Caps, (w) claims arising from a material breach of any of the representations and warranties set forth in Section 5, (x) its rights against the Guarantor under this Guarantee, (y) its rights against Guarantor under the Restrictive Covenant Agreement and (z) its rights against Seller under the Purchase Agreement;

The sixth clause of §6(a) confirms, like the others, that §6(a) is concerned solely with recourse to Guarantor's affiliates for Guarantor liability arising from the Guarantee.  The sixth clause provides that a Successor to the Guarantor (who is, strictly speaking, an affiliate) shall be treated—for all purposes related to unpaid Obligations—like the Guarantor, and not subject to any limitations on recourse to affiliates stated elsewhere in §6(a).  Thus, the sixth clause addresses Successors only with respect to unpaid Obligations.[9]

---

[9]     The sixth and final clause of §6(a) recites:

provided, however, that in the event that the Guarantor (i) consolidates with or merges with any other Person and is not the continuing or surviving entity of such consolidation or merger or (ii) transfers or conveys all or a substantial portion of its properties and other assets to any Person such that the remaining net assets of the Guarantor is less than the Maximum Amount and the transferee thereof does not assume, directly or indirectly, the Guarantor's obligations hereunder, then, and in each such case, the Guaranteed Party may seek recourse, whether by the enforcement of any judgment or assessment or by any legal or equitable proceeding or by virtue of any statute, regulation or other applicable Law, against such continuing or surviving entity or such Person (in either case, a "Successor Entity"), as the case may be, but only to the extent of the unpaid liability hereunder up to the amount of the Obligations for which the Guarantor is liable, as determined in

At each stage, "<u>with respect to the Guarantee</u>" is a bright line.  References to "Seller under the Purchase Agreement" and "Guarantor under the Guarantee" throughout §6(a) clearly limit the scope of §6(a) to the Obligations.  Throughout §6(a), the Guaranteed Party waives, retains or limits "remedy, recourse or right of recovery against, or contribution from, <u>in each case, with respect to this Guarantee</u>."  The phrase "in each case, with respect to this Guarantee" is, by its terms, a limit on <u>both</u> the "remedy, recourse or right of recovery" and the listed "Persons and entities" (Non-Recourse Parties).  Absent that limitation, the definition of "Non-Recourse Party" would indiscriminately shield all "Persons or entities" affiliated with the Guarantor from any claims whatsoever—unrelated to the Guarantee or even the Transaction—by Plaintiffs or their affiliates.  That is not what the language says and would be an absurd reading.

Milken's notion of Non-Recourse Party—that it is solely a function of affiliation with a Guarantor, regardless of the type of claims asserted—negates more than the pervasive limitation "with respect to this Guarantee."  It also makes all of the language in §6(a) superfluous except the list of categories of affiliation.  Milken's assertion that Scantron can never file an action "arising under, or in connection with, this Guarantee, the Purchase Agreement or the transactions contemplated thereby" against, effectively, any Guarantor affiliate (MM Br. 10) makes all of §6(a)'s careful delineation of a Guaranteed Party's waived and retained rights against Guarantor affiliates meaningless.

The only way to effectuate all of the language and meaning of §6(a) is to give effect to the critical linkage—clearly stated in the third clause of §6(a)—between recourse asserted "<u>with respect to this Guarantee</u>" and status as a Non-Recourse Party.  That eliminates what would otherwise be a gratuitous obstacle to a Guaranteed Party's claims against a Guarantor affiliate that are wholly unrelated to "this Guarantee" or "the Obligations."  In forty pages of briefing, neither Defendant articulates a policy or rationale for the "bar" they assert.  Their reading creates obvious unintended conflicts in the Transaction Documents.  █████████████████

---

accordance with this Limited Guarantee. As used herein, unless otherwise specified, the term Guarantor shall include the Guarantor's Successor Entity.

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌  But Scantron would be stymied from asserting this right, on Defendants'

reading, against a Participant who happened to be fit one of the categories of affiliation.  That

outcome has no conceivable basis in the Guarantee.

Moreover, giving meaning to all of the language of §6(a) does not compromise §6(b).  To

the contrary, requiring that a Guarantor affiliate be subject to some kind of recourse "with

respect to the Guarantee" in order to invoke the protection of the Covenant gives meaning to the

inclusion in §6(b) of the "the Purchase Agreement or the transactions contemplated thereby" and

"liabilities or obligations arising under, or in connection with, the Purchase Agreement or any of

the other agreements contemplated thereby, or the transactions contemplated thereby."  Absent

the danger that a Guarantor affiliate will assert §6(b)'s limitations in a context unrelated to the

Guarantee (as Defendants here attempt), the broad scope of §6(b) serves the salutary purpose of

protecting affiliates from actions asserting rights or remedies waived in §6(a), such as a claim

directly against an affiliate for liability arising from a Guarantor's fraud in connection with the

Guarantee, which the fifth clause of §6(a) requires be asserted directly against the Guarantor.[10]

Only under Plaintiffs' reading do the §6(b) Covenant and limitations on recourse complement,

rather than conflict with, §6(a) and other provisions of the Guarantee.  Among other things, the

limitations on recourse in §6(b) effectuate the intent, explicit in §10(b), that recourse against a

Guarantor affiliate be sought only indirectly.

Milken also relies on §6(a) in arguing that the Transaction Documents must presume a

limitation on fraud claims against him because "there would be no need for th[e] allowance of

fraud claims against the Guarantor [in §6(a)] if all claims of fraud were routinely permitted"

---

[10]    The fifth clause of §6(a) retains the Guaranteed Party's rights with respect to "claims
against the Guarantor arising from intentional fraud by the Guarantor," in contrast, *e.g.*, with
"claims arising from a material breach of any of the representations and warranties set forth in
Section 5," and  "rights against the Guarantor under this Guarantee."

(MM Br. 12).  But Milken's premise —that §6(a) "exempts" claims against the Guarantor "from the broad covenants not to sue" (*id.*)—betrays a misconception of §6(a).  The treatment of fraud claims in the fifth clause of §6(a) has nothing to do with claims asserted directly against a Guarantor.  The clause is a carve-out from the Guaranteed Party's waiver of rights <u>as to Guarantor affiliates</u> in the third clause of §6(a), and concerns only the Guaranteed Party's ability to seek recourse from those affiliates for the Guarantor liabilities listed in that clause.

More specifically, Clause 5 begins with the phrase "except, in each case."  There is nothing in §6(a) from which to "except" claims that are asserted directly against the Guarantor. Nothing in §6(a) waives or limits claims against the Guarantor.  The first clause expressly affirms all of the Guaranteed Party's rights against the Guarantor.  The only possible referent is the Guaranteed Party's waiver, in Clause 3, of all "remedy, recourse or right of recovery against, or contribution from, in each case, with respect to this Guarantee" against Guarantor affiliates.

Moreover, viewing Clause 5 as a list of claims against the Guarantor, rather than kinds of Guarantor liability as to which the Guaranteed Party retains the right to proceed against affiliates, would make a significant provision in §10(b) of the Guarantee's termination provisions superfluous.  Section 10(b)(iii) provides for termination if:

> the Guaranteed Party … asserts in any litigation … any theory of liability against the Guarantor or any Non-Recourse Party with respect to the Obligations other than (x) liability of the Guarantor under this Guarantee (as limited by the provisions hereof), (y) liability of the Guarantor arising out of intentional fraud by the Guarantor, subject to the Caps, or (z) liability arising from a material breach of any of the representations and warranties set forth in Section 5.

The "claims" and "rights" listed in the carve-out in §6(a) and the permitted "theories of liability" in §10(b) are precisely parallel.[11]  If Clause 5 were not a carve-out from the Guaranteed Party's waiver of rights against Guarantor *affiliates*, there would be no reason to preserve the

---

[11]     "[L]iability of the Guarantor under this Guarantee" in §10(b)(iii)(x) matches "rights against Seller under the Purchase Agreement" and "rights against Guarantor under this Guarantee" in §6(a)(y) and (z); "intentional fraud" appears in the parallel §10(b)(iii)(y) and §6(a)(w); and "liability for material breach of representations and warranties in the Guarantee" in the parallel §10(b)(iii)(z) and §6(a)(x).

Guaranteed Party's ability to assert the theories of liability underlying the carved out "rights" and "claims."  Further confirming the deliberate parallel, §10(b)(iii) is specifically limited to "theories of liability … <u>with respect to the Obligations</u>."  Moreover, every other part of §6(a) refers to the Guaranteed Party's rights vis-à-vis Guarantor affiliates, and the peculiar mixture of "claims" and "rights" in Clause 5 makes no sense as a list of "claims" against the Guarantor. "Rights against Seller" is not a claim.[12]

### C.    Plaintiffs' Claims Against Raman Do Not Breach Any "Cap"

Raman argues that §1 "caps" the "universe" of his liability in connection with the Transaction.  This argument is clearly wrong because:

- In the Guarantee, "Caps" are defined exclusively with respect to "liability under the Guarantee," which can only include breach of the agreement to indemnify the Obligations, or breach of representations and warranties contained in Guarantee §5.

- As previously demonstrated, § 1 of the Guarantee defines Guarantor's "Obligations" as the guaranteed Seller payment and indemnification obligations.

- Defendants' liability for fraud does not fall within the Obligations.

- Nothing in the Guarantee, or the definitions of "Obligations," Maximum Amounts or "Caps" permits interpretation of capped "liability" to include damages for intentional fraudulent inducement of the transaction.

- The SPA also refers to "Caps," but those limit the Seller's indemnification of Buyer

---

[12]    Nor does Milken's misleading assertion that "Judge Rodriguez determined that [he] was entitled to the benefits of [the Transaction Agreements] as a Non-Recourse Party" compel a different conclusion (MM Br. 13).  Judge Rodriguez expressly declined to resolve this issue (Transfer Order at 16).  To the extent that Judge Rodriguez found that "Milken is a Non-Recourse Party" (*id*. at 5), that finding was made solely to determine Milken's ability to enforce a forum selection clause and based exclusively on Milken's undisputed corporate affiliation with the KUE Guarantor (*id*. at 5 n.4 (noting "Plaintiffs' own pleading alleges that Milken controls KUE LP")).  "The law of the case doctrine"—on which Milken relies—is a discretionary doctrine that "operates only to limit reconsideration of the same issue."  *Fagan v. City of Vineland*, 22 F.3d 1283, 1290 (3d Cir. 1994).  Because the scope of §6(a)'s "Non-Recourse Party" definition was not briefed before, considered, or ruled on, by Judge Rodriguez, this Court's has ample discretion to consider and rule on the issue.  *Id*.  *See also Lambert v. Blackwell*, 387 F.3d 210 (3d Cir. 2004) ("A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance … the law of the case doctrine does not limit a federal court's power, rather it directs its exercise of discretion").

losses to an amount calculated with respect to the Purchase Price.  Since losses from Raman's fraud are not indemnified "Losses" under the SPA, the SPA Caps are irrelevant.

Raman does not even attempt to explain how the Guarantee's Cap limits the "universe of possible relief" for fraud (KR Br. 15), much less compels dismissal of Plaintiffs' claims. Guarantee §1(b)—the section of the Guarantee that Raman cites as the source of his "Cap" (KR Br. 6-7)—defines the "maximum aggregate liability of Guarantor <u>under this Guarantee</u>," or "Aggregate Guarantor Cap," in terms of the <u>Obligations under the Guarantee</u>, as follows:

> [The "Aggregate Guarantor Cap"] shall not exceed Guarantor's Pro Rata Portion of the Maximum Amount [*e.g.*, "maximum aggregate liability of Guarantor and the Other Guarantors under the Guarantees" (§1(a))], less the sum of ... (x) the aggregate amount of any Losses or other amounts (other than any Adjustment Amount) otherwise actually paid to the Buyer Indemnified Parties by the Guarantor under or in respect of this Guarantee and (y) any portion of the Obligations of which the Guarantor is relieved by the satisfaction thereof or pursuant to any written agreement with Buyer and/or the Guaranteed Party[.]

§1(b).  Similarly, the "Per Claim Guarantor Cap," is defined as "the maximum liability of Guarantor <u>under this Guarantee</u> in respect of a specific Loss, Adjustment Amount, fee, Tax or other <u>specific payment obligation of Seller included in the Obligations</u>."  §1(c).  Every component, amount, and defined term in these provisions ties directly to the Seller's payment and indemnification obligations under the SPA guaranteed under §1.[13]  Plaintiffs' claims are unrelated to all of these.

Raman does not argue that the Plaintiffs' claims are barred by the carveout in §6(a), which permits "claims against the Guarantor arising from intentional fraud by the Guarantor; provided, that any such claims shall be subject to the Caps," or §10(b) allowing the Guaranteed Party to assert theories of liability "with respect to the Obligations" including "liability of the Guarantor arising out of intentional fraud by the Guarantor, subject to the Caps."  He cannot, because both references apply exclusively to amounts of Guarantor liability "<u>with respect to this Guarantee</u>" or "<u>with respect to the Obligations</u>" that the Guaranteed Party may attribute to

---

[13]     *See, e.g.*, SPA §10.01 (definition of "Losses"); SPA §1.04(c) (definition of "Adjustment Amount"); SPA §8.02(a) (definition of "Buyer Indemnified Parties"); SPA §1.02(c) (definition of "Purchase Price").

Guarantor affiliates under the carveout in §6(a).  (*See* Point I.B, *supra*).  Emphatically, Plaintiffs' fraud claims are not "with respect to this Guarantee" or "with respect the Obligations."

Raman's failure to substantiate any "breach" of the "cap" dooms his argument that Plaintiffs' claims "triggered the protections …under section 10(b)" (KR Br. 12-13).

### D.    Claims Against Raman Do Not Assert "Proscribed" Theories of Liability

Raman does not explain what he means by "proscribed theories of liability" (KR Br. 13), but, as previously noted, the only provision in the Guarantee that discusses "theories of liability" is §10(b).  Far from proscribing any of the theories set forth in the FAC, however, §10(b) permits assertion of those claims.  The Guarantee terminates only if the Guaranteed Party asserts:

> any theory of liability against the Guarantor or any Non-Recourse Party with respect to the Obligations other than (x) liability of the Guarantor under this Guarantee (as limited by the provisions hereof), (y) liability of the Guarantor arising out of intentional fraud by the Guarantor, subject to the Caps, or (z) liability arising from a material breach of any of the representations and warranties set forth in Section 5.

§10(b)(iii).  This section plainly operates in tandem with the carveout in §6(a) that allows the Guaranteed Party recourse to the Guarantor's affiliates, "in each case, with respect to this Guarantee" for parallel claims.  The theories of liability "with respect to the Obligations" that may be asserted without terminating the Guarantee pursuant to §10(b) are precisely the same theories of liability that may be asserted with respect to the "claims" and "rights" listed in §6(a).[14]  In limiting its scope to claims "with respect to the Obligations," §10(b) deliberately leaves intact all other fraud claims against the Guarantor.

Consequently, because none of Plaintiffs' claims relate to the Obligations, as Raman concedes (KR Br. 12), his contention that Plaintiffs' claims are "proscribed" fails.

### E.    Even If the Claims Against Milken and Raman Were Somehow Proscribed, Filing Suit Terminated the Guarantees *Ab Initio*, Erasing Any Contractual Bar to Suit

If the FAC violated the covenant not to sue by filing proscribed claims against Milken

---

[14]    Confirming the connection to the carveout in §6(a), §10(b) refers to theories of liability asserted against Non-Recourse Parties, to whom the carveout allows liability to be attributed, and also against the Guarantor, through whom such liability passes to the Guarantor's affiliates.

and Raman, the sole consequence of that act is termination of the Guarantee and the corresponding elimination, *ab initio*, of the contract provisions on which Defendants rely.  This is precisely the bargain Defendants struck when they agreed to guarantee the Seller's payment obligations.  Plaintiffs could either have the security of guaranteed payments, up to the negotiated limits, or they could sue Defendants and their affiliates for amounts exceeding those limits—but they could not have both. ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

Section 10(b) embodies Latham's demand, providing that at "such time, if any, as the Guaranteed Party … asserts in any litigation … any theory of liability against the Guarantor or any Non-Recourse Party" barred by the Guarantee, then "this Guarantee shall terminate," and:

> (A) the Obligations of the Guarantor under this Guarantee shall terminate *ab initio* and be null and void, (B) if the Guarantor has previously made any payments under this Guarantee, it shall be entitled to recover such payments from the Guaranteed Party, and (C) neither the Guarantor nor any Affiliate of the Guarantor shall have any liability whatsoever to the Guaranteed Party or any Non-Recourse Party (whether at law or in equity, whether sounding in contract, tort, statute or otherwise) with respect to the Obligations or under this Guarantee.

Guarantees §10(b). ████████████████████

Raman appears to understand this.  He claims that the "protections" of §10(b) have been "triggered," but does not say what they are (KR Br. 12-13).  Instead, he obfuscates that the claims should be dismissed because the Court "should not re-allocate the risks of an unchallenged contract long after the fact" (*Id.* at 15).  But just as Defendants did not allow Plaintiffs to have both the security of the Guarantees and the freedom to sue for unlimited damages, Delaware law does not permit Raman to have it both ways.  "Under Delaware common law, if a [contract] is void *ab initio* … [and never] legally came into effect, then neither did any

of its provisions…."  *Lincoln Nat'l Life Ins. Co. v. Joseph Schlanger 2006 Ins. Trust*, 28 A.3d 436, 441 (Del. 2011) (since life insurance policy was void *ab initio*, the incontestability clause did not bar an insurer from asserting a claim after the incontestability period expired).  Either the Guarantees do not bar the instant claims, as Plaintiffs contend, and the covenant not to sue has not been triggered—or they bar the claims, as Defendants contend, and any prohibitions on the instant claims are null and void.  Either way, Defendants' motions fail.

**F.      Section 6(b) Is Not Only Inapposite but, If Read to Bar Fraud Claims, Unenforceable**

Raman contends that Harland Clarke's claims "fail" because "the only party permitted to sue under and in accordance with the Limited Guarantee is the 'Guaranteed Party,' Scantron" (KR Br. 12 n.6).  The plain language of §6(b), however, states the covenant in a way that makes it irrelevant whether Scantron or its affiliate is the filer:  "The Guaranteed Party hereby covenants and agrees that it shall not institute, and shall cause each of its Affiliates and representatives not to institute, directly or indirectly, any Action...."  In other words, Harland Clarke may do whatever Scantron may do.

Raman argues, futilely, that Plaintiffs' claims are barred by §6(b), which states that "the sole and exclusive remedy of the Guaranteed Party … against the Guarantor …  in connection with[] the Purchase Agreement or any of the other agreements contemplated thereby, or the transactions contemplated thereby" shall be claims under §6(b)(i), and Plaintiffs' claims are not, as §6(b)(i) requires, "under and in accordance with the Guarantee." (KR Br. 12).  It is true that Plaintiffs' claims do not relate to the Obligations or to the Guarantor's performance of any duties in the Guarantee.  However, insofar as Plaintiffs' claims depend on allegations that Milken and Raman, as knowledgeable GlobalScholar insiders, fraudulently induced Plaintiffs to buy GlobalScholar, the claims are "in connection with" the "transaction[] contemplated" by the Purchase Agreement, (*id.*), which expressly carves fraud claims out of its "Limitation on Recourse" provision.  *See* SPA §8.09.  In ruling that the Guarantee's forum clause (§12) applied to Plaintiffs' claims, Judge Rodriguez found that: "to the extent Plaintiffs bring claims 'arising

from intentional fraud,' those claims were contemplated by the Transaction Documents and are 'under and in accordance with' the Purchase Agreement or Guarantee."  Transfer Order at 17.[15]

The attenuated relationship between the Guarantee and claims that have nothing to do with the Obligations demonstrates why Raman's interpretation of §6(b) is untenable.  If §6(b)'s covenant not to sue does constrain fraud claims that have no connection to the payment obligations governed by the Guarantee in which the provision is found, or to any other contractual relation between the parties, this Court should not enforce it.  Even where there is a direct relationship, Delaware courts do not enforce no-recourse clauses to bar fraud and other non-contract claims.  *See Cont'l Ill. Nat'l Bank & Trust Co. v. Hunt Int'l Res. Corp.*, C.A. Nos. 7888, 7844, 1987 WL 55826, at *6 (Del. Ch. Feb. 27, 1987) ("no recourse" clause did not "operate to bar [an indenture trustee] from maintaining an action for common law fraud").  *See also Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 793 (Del. Ch. 1992) ("[A]n alter ego claim is distinct from a contract claim and is equitable in nature.… [T]he no recourse provision does not bar equitable claims."); *Mabon, Nugent & Co. v. Tex. Am. Energy Corp.*, C.A. No. 8578, 1988 WL 5492, at *3 (Del. Ch. Jan. 27, 1988) ("Restrictive indenture provisions … have been enforced by our courts where the claim is one for breach of contract," held:  no-recourse clause did not bar equitable claims).

The absence of any relationship between Plaintiffs' fraud claims and the "Obligations" covered by the Guarantee confirms that §6(b) cannot be enforced to bar Plaintiffs' claims.  In *Abry*, the Court emphasized Delaware's strong public policy against enforcement of contractual provisions that serve to exculpate fraud, which is equally applicable here:

> The public policy against fraud is a strong and venerable one that is largely founded on the societal consensus that lying is wrong.…
>
> There is a strong tradition in American law that holds that contracts may not

---

[15]     It should be noted that similar language is **not** found in §6(a), and the Transfer Order has no impact on the definition of "Non-Recourse Parties" in that section.  The Transfer Order specifically addressed the language "or the transactions contemplated …," which is found **only** in the forum clause (§12) and in §6(b)'s covenant not to sue — and is **not** part of the limitation "with respect to this Guarantee" found in §6(a).  *See* Transfer Order at 10-12, 16-17.

insulate a party from damages or rescission resulting from the party's fraudulent conduct. In that vein, the Restatement of Contracts states:  "[a] term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy."  Specifically, "[a] provision in a bargain that fraud in its formation shall not be asserted is illegal." The Restatement's position finds resonance in a deep body of case law as well as in leading treatises.… [C]ontrary to the argument that only a full exemption of liability, not a mere limitation of liability, was contrary to public policy, "the rationale behind the doctrine—to prevent parties from shielding themselves from liability from their own fraud by inserting a clause into the very contract that was procured by the fraud—applies equally to the limitation of liability and to the exclusion of liability."  This sort of reasoning draws in no small measure from the nostrum *fraus omnia corrumpit*— fraud vitiates everything it touches.

891 A.2d at 1035-36, 1058-59.  The policies against contractual provisions exculpating a party's fraud reiterated in *Abry* apply with equal force to the Guarantee provisions that Defendants contend foreclose Plaintiffs' claim.

## III.    PLAINTIFFS' CONTRACTUAL DISCLAIMERS ARE NOT ANTI-RELIANCE CLAUSES

Defendants argue that "Scantron affirmatively disclaimed reliance on the extra-contractual alleged representations on which plaintiffs now sue" (MM Br. 13; see *also id.* at 7-8, 14, 16-19; KR Br. 2, 4-6, 16-19). However, the SPA provisions Defendants cite lack the critical no-reliance language required to preclude claims of fraudulent inducement.  Delaware courts "have not given effect to so-called merger or integration clauses that do not clearly state that the parties disclaim reliance upon extra-contractual statements," but instead hold that "murky integration clauses, or standard integration clauses without explicit anti-reliance representations, will not relieve a party of its oral and extra-contractual fraudulent representations."  *Abry*, 891 A.2d at 1058-59.  Courts of this State will dismiss fraudulent inducement claims only if there is "a clear and unambiguous contractual provision in which the plaintiffs forthrightly affirm that they are not relying upon any representation or statement of fact not contained within the LLC Agreement." *Kronenberg v. Katz*, 872 A.2d 568, 591 (Del. Ch. 2004).  As the *Kronenberg* Court stated:

[F]or a contract to bar a fraud in the inducement claim, the contract must contain language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon

statements outside the contract's four corners in deciding to sign the contract.

*Id.* at 593.

By contrast, SPA §3.21 merely states that the Seller disclaims making any extra-contractual representations or warranties, and, in SPA §6.06, Scantron does nothing more than acknowledge that Seller has made that disclaimer.  In *Anvil*, the Court found that equivalent disclaimers did not "reflect a clear promise by the Buyer that it was not relying on statements made to it outside of the Agreement to make its decision to enter into the Agreement" because they "do not state that the parties *disclaim reliance* upon extra-contractual statements."  2013 WL 2249655, at *8.  Like the SPA provisions Defendants cite, the *Anvil* disclaimers merely "indicate[d] that the Company represented that neither it nor any Seller was 'making any other express or implied representation or warranty with respect to the Company.'"  *Id.*  Here, as in *Anvil*, "[t]he Buyer's fraud claim is not precluded by this promise.  … [T]here is no 'double liar' problem where allowing the Buyer to prevail on its fraud claim would sanction its own fraudulent conduct in having falsely asserted that it was relying only on contractual representations."  *Id.*  Nothing in SPA §§3.21, 6.06, or any other part of the Transaction Documents contains any such disclaimer of *reliance*.[16]  All of the disclaimer cases Defendants cite involve contractual provisions containing clear and explicit anti-reliance language not found in the SPA.[17]

---

[16]    Nor do Defendants identify any basis to preclude claims premised on intentional nondisclosure of material facts.  *See, e.g.*, ¶¶31, 32, 50-55.  *See Transdigm Inc. v. Alcoa Global Fasteners, Inc.*, C.A. 7135-VCP, 2013 WL 2326881, at *1, *8-*9 (Del. Ch. May 29, 2013) (holding that anti-reliance provisions that do not disclaim reliance on omissions "do not bar the buyer's claim for fraudulent concealment of material information").

[17]    *See RAA Mgmt., LLC v. Savage Sport Holdings, Inc.*, 45 A.3d 107, 110 (Del. 2012) (buyer waived the "accuracy or completeness" of disclosures and also any seller liability for the buyer's use of any information other than representations and warranties in the final agreement); *Abry*, 891 A.2d at 1041-43, 1064 (disclaimer of accuracy and completeness of pre-contractual disclosures and any seller liability; acknowledged buying on an "as is" basis; unenforceable to preclude claims for fraud in written agreement); *Homan v. Turoczy*, C.A. No. 19220, 2005 WL 2000756, at *16 (Del. Ch. Aug. 12, 2005) (buyers "do not rely on any written or oral representation or statement not expressly written in this Agreement"); *St. James Recreation, LLC v. Rieger Opportunity Partners LLC*, C.A. No. 19346, 2003 WL 22659875 (Del. Ch. Nov. 5, 2003) (buyer warranted it had made all due diligence it deemed appropriate and received

Similarly, SPA §11.08 is "a standard integration clause…. It defines the parties' agreement.  It does not disclaim reliance." *Airborne Health*, 984 A.2d at 141.  *See also Tek Stainless Piping Products, Inc. v. Smith*, C.A. No. N13C-03-175 MMJ CCLD, 2013 WL 5755468, at *4 (Del. Super. Ct. Oct. 14, 2013) (integration clause is "not an anti-reliance clause [when it] is not a clear and unambiguous agreement that the parties are not relying upon any representation or statement of fact not contained within the [agreement]").  Numerous decisions reject efforts to characterize such integration clauses affirming the absence of any other "understandings" as an implied promise that the parties were not "relying" on such understandings.  In *Kronenberg*, where, *unlike* the SPA, the integration clause even affirmed the absence of any "inducements," the Court affirmed that:

> The presence of a standard integration clause alone, which does not contain explicit anti-reliance representations and which is not accompanied by other contractual provisions demonstrating with clarity that the plaintiff had agreed that it was not relying on facts outside the contract, will not suffice to bar fraud claims. Rather, in that circumstance, the defendant will remain at risk if the plaintiff can meet the difficult burden of demonstrating fraud.

*Kronenberg*, 872 A.2d at 591, 593.  *See also Airborne Health*, 984 A.2d at 140 ("an anti-reliance provision must be explicit, and a standard integration clause is not enough"); *Tek*, 2013 WL 5755468, at *3 ("A traditional integration clause will not be contorted into anti-reliance language, in the absence of evidence that the parties intended for the clause to bar fraud claims."); *Alltrista Plastics, LLC v. Rockline Indus.*, C.A. No. N12C-09-094 JTV, 2013 WL

---

adequate responses to its inquiries); *Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*, C.A. No. 19209, 2002 WL 1558382, at *5 (Del. Ch. July 9, 2002) (disclaimed all collateral representations and disclaimed "reliance upon any such promise, representation or warranty not contained herein"); *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 552 (Del. Ch. 2001) (buyer acknowledged seller's disclaimer of the accuracy and completeness of such disclosures, and of any liability resulting from buyer's use of pre-contract disclosure); *DeBakey Corp. v. Raytheon Serv. Co.*, C.A. No. 14947, 2000 WL 1273317, at *27 (Del. Ch. Aug. 25, 2000) (more than absence of express contract provision protecting counterclaim plaintiff, court found it most "plausible" that the "corporate colossus" was "unable to conclude that the plaintiffs had defrauded them, but nonetheless asserted the fraud counterclaim as a litigation tactic"); *MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 210 (3d Cir. 2005) (credit risk insurer explicitly waived "any fraud with respect to the student loans" and "any other rights or defenses … to … payment").

5210255, at *6 (Del. Super. Ct. Sept. 4, 2013) ("Because the Supply Agreement's integration clause contains no explicit anti-reliance language, Rockline is not barred from bringing a claim for intentional misrepresentation against Jarden.").

Even an explicit anti-reliance clause is unenforceable as "contrary to public policy if it would operate as a shield to exculpate defendant from liability for its own intentional fraud," especially when the fraud, like Defendants' here, goes "to the very core of the Agreement." *Overdrive, Inc. v. Baker & Taylor, Inc.*, C.A. No. 5833-CC, 2011 WL 2448209, at *6 (Del. Ch. June 17, 2011); *see also Anvil*, 2013 WL 2249655, at *7 n.29 (rejecting dismissal or limitation of fraud claim where "misrepresentations or omissions by Individual Defendants during meetings leading up to the closing of the Transaction . . . render[ed] the contractual representation false" and citing *Overdrive*, 2011 WL 2448209, at *6). Defendants were not the Seller, but the FAC alleges many misrepresentations that were closely linked to representations in the SPA, demonstrating their centrality.[18]

Moreover, like the Purchase Agreement in *Anvil*, the SPA throughout "reserve[s] all rights with respect to any claims based on fraud or the bad faith of any party." *Anvil*, 2013 WL 2249655, at *8. The SPA's "Exclusive Remedy" and "Limitation on Recourse" clause both reserve the parties' rights to bring fraud claims. *See* SPA §8.07 (clause "shall not (x) apply to

---

[18] *Compare, e.g.*, ¶32 ("Many of GlobalScholar's customers were sold product capabilities … that simply did not exist … [and] GlobalScholar was not prepared to service or capable of delivering contracted requirements.") and ¶24 (Raman misrepresented "the strength of GlobalScholar's customer relationships"), *with* SPA §3.08(b) ("No Purchased Subsidiary … is … in breach … in any material respect under any such Material Contract. None of the Purchased Subsidiaries ,,, has received … to Seller's knowledge, oral notice … of any material breach or violation of … any Material Contract."). It is well-settled that statements which form the basis for the decision to purchase a business and are reflected in the purchase agreement "plausibly pleads reliance" for fraud. *OpenGate Capital Grp. LLC v. Thermo Fisher Scientific Inc.*, No. 13-1475-GMS, 2014 WL 3367675, at *8 (D. Del. July 8, 2014) (Sleet, J.)

It is also well-settled that corporate officers, like Defendants, may be "held personally liable" for fraud "even if they were acting officially for the corporation in committing the tort." *Marino v. Cross Country Bank*, C.A. No. 02-65-GMS, 2003 WL 503257, at *7 (D. Del. Feb. 14, 2003) (Sleet, J.). Significantly, neither Defendant's motion is premised on the absence of a genuine issue of material fact as to whether the alleged fraudulent misrepresentations were made.

any claims that arise from intentional fraud"), SPA §8.09 ("other than … arising from intentional fraud, no claim shall be brought …").  These SPA clauses constitute dispositive "other language in the … Agreement provid[ing] further evidence that the parties intended that fraud claims could be based on extra-contractual representations."  *Id.*

## CONCLUSION

The language of the Transaction Documents unambiguously contradicts Defendants' arguments, requiring denial their summary judgment motions.  Should the Court determine that an ambiguity exists, that, too, would defeat Defendants' motions.  Accordingly, for the reasons set forth above, Plaintiffs respectfully request that the Court deny the motions by defendants Milken and Raman for summary judgment in their entirety.

Respectfully submitted,

SEITZ ROSS ARONSTAM & MORITZ LLP

*Of Counsel*:

Gregory P. Joseph
Mara Leventhal
Gregory O. Tuttle
Michael P. Richter
JOSEPH HAGE AARONSON LLC
485 Lexington Avenue, 30th Floor
New York, NY  10017
(212) 407-1200
gjoseph@jhany.com
mleventhal@jhany.com
gtuttle@jhany.com
mrichter@jhany.com


Dated:  August 18, 2014

*/s/ Collins J. Seitz, Jr.*
Collins J. Seitz, Jr. (#2237)
David E. Ross (#5228)
Benjamin J. Schladweiler (#4601)
100 S. West Street, Suite 400
Wilmington, DE  19801
(302) 576-1600
cseitz@seitzross.com
dross@seitzross.com
bschladweiler@seitzross.com

*Counsel for Plaintiffs Harland Clarke*
*Holdings Corp. and Scantron Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I, Collins J. Seitz, Jr., hereby certify that on August 18, 2014, a true copy of the foregoing

*[SEALED] Memorandum of Points and Authorities in Opposition to Defendants' Motions for*

*Summary Judgment* was served via electronic mail upon the following counsel of record:

Kevin G. Abrams
John M. Seaman
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, DE  19807
abrams@abramsbayliss.com
seaman@abramsbayliss.com

Susan R. Estrich
B. Dylan Proctor
John B. Quinn
Michael T. Zeller
QUINN EMANUEL URQUHART & SULLIVAN LLP
865 S. Fiqueroa Street, 10th Floor
Los Angeles, CA  90017
susanestrich@quinnemanuel.com
dylanproctor@quinnemanuel.com
johnquinn@quinnemanuel.com
michaelzeller@quinnemanuel.com

*Counsel for Defendant Michael Milken*

Edmond D. Johnson
Bradley W. Voss
James H.S. Levine
Christopher B. Chuff
PEPPER HAMILTON LLP
1313 Market Street, Suite 5100
Wilmington, DE  19899-1709
johnsone@pepperlaw.com
vossb@pepperlaw.com
levinejh@pepperlaw.com
chuffc@pepperlaw.com

*Counsel for Defendant Kalyanaraman
Srinivasan*

 */s/ Collins J. Seitz, Jr.*
Collins J. Seitz, Jr. (#2237)